Gene DENNISON, individually and as guardian of Mickey Brogren, a minor, Plaintiff,

v.

Pine County Deputy Sheriff Robert VIETCH, Rush City Police Officer Roger Randolph, Pine County Sheriff John Kozisek, Joette Brogren, County of Pine, Minnesota, a municipal corporation, and others unknown to the plaintiff, Defendant.

Civ. No. 4–80–147.

United States District Court, D. Minnesota, Fourth Division.

March 18, 1983.

Rolf Gilbertson, Maun, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, Minn., for defendant Randolph.

Theodore Smetka, Arthur, Chapman & Michaelson, Minneapolis, Minn., for defendants Kozisek, Veitch, Pine County.

Patrick Sauter, Mahoney, Dougherty & Mahoney, Minneapolis, Minn., for County of Pine.

Barry L. Blomquist, Sr., Blomquist & De-Wan, North Branch, Minn., Barry L. Blomquist, Jr., Blomquist & Epeset, Minneapolis, Minn., for plaintiff.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiff Gene Dennison brought this action for damages and injunctive relief against defendants Robert Vietch, Roger Randolph, John Kozisek, Joette Brogren,[1] and Pine County, Minnesota, under 42 U.S.C. §§ 1983, 1985, and 1986 for violation of his civil rights. Dennison also asserts state law claims. The case arises out of a warrantless entry into Dennison's home by police officer defendants Vietch and Randolph, along with defendant Brogren, to remove the child of Dennison and Brogren from Dennison's custody.

This action was tried to the court for three days in January, 1983. At the outset of trial plaintiff dropped all claims made on behalf of his minor child, Mickey Brogren. During the trial the court dismissed claims under 42 U.S.C. §§ 1985 and 1986. The court having considered all the evidence received at trial, having observed the demeanor of the witnesses who testified and weighed their credibility, and having reviewed the arguments and memoranda of counsel, now enters this Memorandum Opinion and Order for Judgment as its findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I. *Facts*

Plaintiff Gene Dennison, age 22, and defendant Joette Brogren are the unwed parents of Mickey Brogren, born on April 12, 1978. Defendant Pine County is a municipal corporation in the State of Minnesota, and defendant John Kozisek was the Pine County Sheriff in 1979. At all times pertinent herein defendant Robert Vietch was a deputy with the Pine County Sheriff's Department, and defendant Roger Randolph was an officer in the Rush City Police Department.

From December, 1977 through September, 1978 Dennison and Joette Brogren lived together in a house in Pine City rented by Joette Brogren's father, Leslie Brogren. Leslie Brogren was a nominal resident of the house, but usually lived at his brother's house. He paid the rent due on the house, but Dennison and Joette Brogren paid him for their rent.

Dennison had two contacts with the Pine County Sheriff's Department at this resi-

---

1. Although served with the complaint, Joette   Brogren has never answered.

dence. A tracer on the telephone line of the local high school principal indicated that a harassing telephone call, from what sounded to be a male, had come from the telephone in Dennison's house on the night of January 17, 1978. In investigating the telephone call, officers obtained Leslie Brogren's permission to enter the house. Vietch and another officer from the Pine County Sheriff's Department entered the home some time after midnight. They awakened Dennison and questioned him.

Another incident occurred on January 29, 1978, when an officer of the Pine County Sheriff's Department questioned Dennison about an allegation of theft made against him. When given the alternative of being taken to the police station for questioning, Dennison consented to questioning in his home. Officer Vietch testified at trial that during these and other incidents, Dennison displayed a poor attitude toward the police and acted disrespectfully toward them.

On April 12, 1978, Joette Brogren gave birth to Mickey Brogren. Dennison and Joette Brogren continued to live together and raise Mickey for the first six months of her life. Dennison then moved out and Mickey continued to live with her mother. Dennison would take Mickey for overnight visits two or three times a week. He purchased some baby clothes and toys which he kept on hand for Mickey's visits. By March, 1979, Dennison had moved into an apartment at 469 West Fourth Street, Rush City, Minnesota. Although located in Chisago County, Dennison's apartment was only about fifteen miles from Pine City where Joette Brogren lived. Dennison continued to receive Mickey for visits in Rush City.

Joette Brogren called Dennison on May 27, 1979 and asked him to take Mickey for awhile. Joette told Dennison she was tired of the child and needed a break. On June 1, 1979 Joette called Dennison and asked

him to come and get Mickey's clothes. At that time she told Dennison she didn't want to see Mickey anymore. On June 5, 1979 Joette Brogren again called Dennison; this time she asked to take Mickey back. Dennison refused. Dennison then contacted Rush City Police Chief Elmer McDermott and county welfare worker Martha Voltz for advice. As a result of these communications he believed that there was no need to return the child. Dennison kept the child.

The incident prompting this lawsuit occurred on June 8, 1979. Shortly after midnight, early in the morning of June 8, Joette Brogren went to see Officer Vietch and asked his assistance in getting Mickey back. She told Vietch that Dennison had the child and would not return her. Vietch testified that she also told him that she had heard the child had been thrown around like a football at a party.[2] At the time Vietch believed Dennison was either the husband or ex-husband of Joette Brogren and was aware that Dennison had had custody of the child before.

Vietch drove to Rush City with Joette Brogren to retrieve the child that night.[3] Since Rush City was outside of Pine County, Vietch sought out Rush City Police Officer Randolph for directions and assistance. Vietch told Randolph that Dennison had Joette Brogren's child and refused to return it. No mention was made of any allegation of abuse. Randolph testified that he had seen groups of people at the house in the past and thought he should be present in case of trouble.

Vietch pounded on the front door of Dennison's apartment with his flashlight but received no response. Vietch and Randolph then aroused the upstairs neighbor, Patricia Pike, and received her grudging permission to go through her apartment to reach a

---

2. Vietch apparently asked no questions about this nor did he ever file a child abuse report even though he testified he was aware of a child abuse statute. He also made no mention of any report of abuse when he was called upon to testify at a November, 1979 custody hearing.

3. Vietch testified that he was aware of Minnesota civil process that could be used the next day to seek return of the child.

back entry to Dennison's apartment.[4] As Vietch and Randolph proceeded through Pike's apartment, Pike informed them that Dennison had custody of the child and had talked to county officials about continuing custody. Once Vietch and Randolph were at Dennison's back door, they knocked but received no answer.

At approximately 2 a.m. Vietch and Randolph entered Dennison's apartment through the unlocked back door. Both officers testified they knew by training they could only enter a home lawfully with consent or a search warrant or under exigent circumstances. Vietch also testified that he understood state law allowed entry when an officer reasonably believed the well being of a child was in danger. Both officers claimed at trial they entered out of concern for the child.

Vietch and Randolph proceeded through the apartment, entering through the kitchen and then into the living room. They noticed no unusual odors but did observe dirty dishes, empty beer bottles, and a marijuana pipe in an ashtray. Numerous beer cases were used as plant stands or tables. Vietch shined his flashlight into the bedroom. Dennison was asleep on the bed, and the child was sleeping on a cushion at the foot of the bed. She was uncovered and dressed in a nightgown and diapers. The child showed no signs of abuse. Vietch shone his flashlight in Dennison's face, aroused him, announced his presence, said he had come for the child, and ordered Dennison to get dressed and come into the living room.

Angered and upset, Dennison entered the living room and asked Vietch what right he had to be in the house. Dennison claimed he was told by county officials that he could keep the child. Vietch asked Dennison to produce a court order establishing his right to custody. When Dennison produced none, Vietch let Joette Brogren in the front door to get Mickey. Joette asked for Mickey's clothing which Dennison turned over, in- cluding clothes he had purchased. Joette and Dennison started a heated argument, each trading charges that the other was an unfit parent. Vietch then told Joette to leave. Dennison tried to follow her, but Vietch prevented him from going after her. Dennison continued to argue with Vietch about the officers' right to come into his house and take his child. After a few minutes of argument, Vietch and Randolph left.

Vietch returned to Pine County with Joette and Mickey Brogren. He testified that he inspected Mickey for signs of abuse and found none. At about 3 a.m. Vietch contacted Sheriff Kozisek to inform him of the incident. Kozisek inquired as to whether Vietch had contacted the county's social services department. Vietch indicated that he had. Vietch testified that the social services department told him to leave the child with its mother if the premises were clean and that the department would investigate the next day. Vietch testified that he decided to leave Mickey with her mother based upon the relative appearances of the parents' places of residence and upon his general knowledge of the attitudes of both Joette Brogren and Gene Dennison.

Later on June 8, Dennison was still quite disturbed about the incident and contacted Kozisek and Vietch to complain about the intrusion and taking of his child. Patricia Pike called the Pine County Sheriff's Office to complain about the entry into her home. Dennison also submitted a written statement and complaint to the Pine County Attorney's Office.

In response to Dennison's complaints the county initiated custody proceedings, and there was also evidence of some internal police investigation. Dennison testified to no lasting emotional distress beyond that he experienced around the time of the incident, except to testify that he no longer trusts or respects police officers.

Dennison had two further contacts with the Pine County Sheriff's Department. In

---

**4.** Vietch told Pike that if they could not enter through her apartment, the officers would have to kick Dennison's door in.

November, 1979, Dennison was called for questioning about a window-breaking incident, and in March, 1980, he and others were riding in a car in Hinckley, Minnesota between 2 and 3 a.m. when they were stopped and questioned by Officer Vietch. Vietch testified that he stopped the car, without knowing who was inside, because it was late at night and there had been a recent rash of burglaries in the area. Vietch told Dennison and the others to go home.

## II. *Claims Under 42 U.S.C. § 1983*

### A. Claims Against Officers Vietch and Randolph

■ The court finds that both Officers Vietch and Randolph violated Dennison's civil rights when, acting under color of state law, they: (1) unreasonably entered and searched Dennison's home in violation of the Fourth and Fourteenth Amendments, and (2) deprived Dennison of his protected. liberty interest in the custody of his child without due process of law, in violation of the Fourteenth Amendment.

■ The Fourth and Fourteenth Amendments to the Constitution of the United States protect a citizen's right to privacy in his home from unreasonable intrusion by the state or its political subdivisions. *See Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In order to enter a person's home without a warrant or consent a police officer must have probable cause to enter and exigent circumstances. *United States v. Wentz,* 686 F.2d 653 (8th Cir.1982).

■ Defendants Vietch and Randolph contend they acted under exigent circumstances, that they acted out of concern for the physical well being of Mickey Brogren pursuant to Minn.Stat. § 260.165,[5] but the court finds no credible evidence to conclude that Officers Vietch and Randolph were reasonably acting out of concern for the immediate welfare of the child.[6] There was no evidence that the child's safety was in danger. No party was in progress. The house was dark and quiet. All occupants appeared to be sleeping soundly. There was no testimony to suggest that Dennison was under the influence of alcohol or any drug. Although Mickey slept uncovered, that was no evidence of neglect on a warm June evening. The officers could observe that she showed no signs of abuse.

Testimony that Vietch was concerned about possible child abuse was impeached. As to Officer Randolph, there was no evidence that he was ever told of any concern for child abuse. His actions could hardly be justified as a reasonable concern for the child's safety. Similarly, the testimony that the officers were concerned about possible asphyxiation due to a furnace problem appeared to be merely an after-the-fact justification.

■ To explain the actions taken by Vietch and Randolph, one is only left with Joette Brogren's claim of a custody right to her daughter. This is not sufficient to justify entry into the Dennison home in the middle of the night because it does not constitute exigent circumstances as required for a warrantless entry under the Constitution or a reasonable basis for concern for the welfare of a child under Minn. Stat. § 260.165.

The remaining questions are whether Dennison's interest in his child is a constitutionally protected interest and, if so, whether due process was provided. *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

---

5. Minn.Stat. § 260.165 provides in part:
Subdivision 1. No child may be taken into immediate custody except:

. . . . .

(c) By a peace officer . . .
(2) when a child is found in surroundings or conditions which endanger the child's health or welfare or which such peace officer reasonably believes will endanger such child's health or welfare.

6. Defendants rely upon *In Re Welfare of Scalzo,* 300 Minn. 548, 220 N.W.2d 495 (Minn.1974) to support their claim that their entry was justified under Minn.Stat. § 260.165. Unlike this case, police in *Scalzo* had ample evidence to justify a concern for the child's safety.

■ The interest asserted by Gene Dennison is substantial. As the unwed father of Mickey Brogren, Dennison had played an active role in raising her up to that time. He was concerned for Mickey's welfare based upon what he heard from Joette Brogren when she asked him to take Mickey. Dennison had an interest in the custody of Mickey, in her well being, in providing a family environment in which she was wanted, and in minimizing the disruptive effects of changing custody on a very young child. Similar interests have been recognized as protected liberty interests under the Fourteenth Amendment. *See e.g. Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (interest of a natural father in the custody of illegitimate children he raised is a protected interest entitled to predeprivation hearing); *Rivera v. Marcus,* 696 F.2d 1016 (2d Cir.1982) (protected liberty interest in the family relationship of a custodial half sister to children whose parents have shown no interest in raising them). Dennison's asserted interest must also be recognized as a liberty interest worthy of protection under the Fourteenth Amendment.

Defendants contend that the custody hearing held sometime after Vietch and Randolph took Mickey Brogren was sufficient to satisfy the due process requirement in this case. Due process does not always require a predeprivation hearing. *See Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1975). The court must consider three factors in determining what process is due: the private interest affected, the risk of erroneous deprivation of that interest by the process used, and the governmental interest, including fiscal and administrative burdens, that an alternate procedure would require. *Id.* at 335, 96 S.Ct. at 903.

As already noted, the private interest at stake is substantial. The state must be loath to intrude upon the family relationship in the absence of good evidence that a child's welfare is immediately jeopardized. A parent's concern for the custody and welfare of his or her child is an important private interest.

The procedure used by defendant to take temporary custody of a child from one parent to give to another carries a significant risk of erroneous deprivation. Where a child's immediate safety is not truly at issue, a police officer is ill-suited to make a snap custody decision in the middle of the night based upon the representations of one party to a dispute, or upon the visual inspection of one parent's residence. The factors bearing on parental fitness are far too complex for that. Nothing can be accurately concluded about the relative fitness of either parent on the basis that defendants Vietch and Randolph acted.

Since no real issue of the child's immediate safety was at stake, it is difficult to see the government's interest in acting in the middle of the night to resolve a mere conflict of assertions between parents as to who should have their child. There were established procedures for custody hearings with which defendants Vietch and Randolph were familiar, and they could have withheld action until the next day. The evidence showed that Pine County was able to act to remove a child within one day by using civil process.

■ In the circumstances presented here, a parent with custody of a child is at least entitled to some hearing or investigation at a civil hour of the day before action to deprive the parent of custody of his or her child. Officers Vietch and Randolph, by acting to deprive Dennison of his child without some prior process, violated Dennison's due process rights.

■ Defendants Vietch and Randolph raise the affirmative defense of good faith immunity.[7] The standard for finding good faith in § 1983 action is an objective one. *Green v. White,* 693 F.2d 45 (8th Cir.1982).

---

7. Only defendant Randolph pleaded the defense as required. *See Harris v. Pirch,* 677 F.2d 681 (8th Cir.1982). Vietch has moved to amend his answer to include this defense. Since leave to amend the pleadings "shall be freely granted when justice so requires," Fed.R.Civ.P. 15, the court has treated Vietch's liability as if the pleadings have been so amended.

To find immunity, the court must find that defendants' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ Both Vietch and Randolph knew or should have known their actions violated clearly established rights. Both officers testified to their knowledge of the constitutional prerequisites of a search or entry into a person's home. Similarly, they testified they were given training about the Minnesota statute providing for circumstances under which the immediate taking of custody of a child is permitted. As already noted, there was no evidence that Mickey Brogren's health or welfare was in immediate jeopardy as required to take custody under the Minnesota law. As to the constitutional requirements protecting Dennison's custody rights, these have been clearly established since *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Defendants have shown no reason why they should not be held to have known that Dennison had a protected liberty interest in the custody of his child. *See Harlow v. Fitzgerald,* 102 S.Ct. at 2739 (a competent public official may be held to know clearly established law unless he or she proves extraordinary circumstances). Neither Vietch nor Randolph have shown they are entitled to good faith immunity from liability for their actions.

### B. Claims Against Sheriff Kozisek

■ Sheriff Kozisek may not be held vicariously liable for the actions of Officer Vietch. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To be liable, Kozisek must have exercised control or direction over Vietch's actions and either personally participated in the actions or failed to supervise so as to contribute to plaintiff's injury. *Id.* Kozisek could also be liable as a member of a civil conspiracy

causing plaintiff's constitutional injuries. *Putman v. Gerloff,* 701 F.2d 63 (8th Cir. 1983).

There is no evidence that Sheriff Kozisek knew of Vietch's intentions or that he failed to provide Vietch with the proper training. When informed of Vietch's actions, he instructed him to consult with the county social services office. There is evidence that Kozisek followed up by talking to Vietch the next day. There is also evidence of an investigation made some time after plaintiff's complaints. Finally, the county proceeded with a custody hearing. There is no evidence to suggest that these subsequent actions were insufficient and no evidence of a failure to supervise.

Similarly there is no evidence to support a finding that Kozisek was a member of a civil conspiracy. There is nothing to suggest that he acted in concert with Vietch and Randolph or that an understanding to violate plaintiff's civil rights existed between the defendants.

### C. Claims Against Pine County

■ Pine County may be liable under § 1983 only if Vietch's actions may be considered to implement a policy, custom, or practice of the county. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). There is no evidence of unconstitutional policies, customs, or practices. The entries into Dennison's residence on January 17 and 29, 1978 were consensual. (Leslie Brogren consented to the first and Dennison himself to the second.)[8] Finally, the evidence shows that the officers received proper training as to the standard for entry without a warrant and for taking custody of a child.

### D. Claims Against Joette Brogren

■ Plaintiff has made no showing that Joette Brogren's conduct may be deemed to have been under color of state law as required by 42 U.S.C. § 1983. There is no

---

**8.** The stop of Dennison's car in March, 1980 was not pled; defendants were not notified prior to trial of this incident and did not consent to try it.

diversity of citizenship between Joette Brogren and Dennison to support federal jurisdiction over the state law claims against her, and since plaintiff has failed to make any effort to obtain a judgment, or even submit proposed findings relative to Joette Brogren's liability, the court sees no reason to exercise pendent jurisdiction over these claims. *See State of North Dakota dba Bank of North Dakota v. Merchants National Bank and Trust Co.,* 634 F.2d 368 (8th Cir.1980). Accordingly, all claims against Joette Brogren shall be dismissed.

### III. *State Law Claims*

Plaintiff has asserted claims for trespass and false imprisonment under Minnesota law.[9]

█ The claim for false imprisonment finds no support in the evidence. Officer Vietch acted properly to keep the peace when he separated Joette Brogren and Dennison in the midst of a heated argument and prevented an angry Dennison from following Brogren. The requisite intent was not present where Vietch sought only to keep the peace.[10]

█ Plaintiff has offered evidence of trespass. *See generally* 19A *Dunnell Minn. Digest 2d,* Trespass § 1.02 (3d ed. 1978); W. Prosser, *Law of Torts* § 13 (4th ed. 1971). Any damages that plaintiff has sustained as a result of trespass are not different from those sustained in defendants' unconstitutional entry. It is therefore unnecessary to discuss this claim since it is the recognized policy in Minnesota law to avoid double recovery of damages. *See e.g., Langenberger v. Dahl,* 329 N.W.2d 69 (Minn.1983).

### IV. *Damages and Injunctive Relief*

█ The basic purpose of awarding damages under 42 U.S.C. § 1983 is compensation for injuries caused by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). Violations of certain substantive constitutional rights are compensable by a substantial award independent of proof of actual injury. *Villaneuva v. George,* 659 F.2d 851 (8th Cir.1981).

█ Plaintiff has not proven he has a right to recover compensatory damages for any pecuniary loss. The baby clothes taken by Joette Brogren were turned over by Dennison himself. Moreover, there was no evidence that Dennison purchased clothes for Mickey to wear only while in his custody. Nor was there any proof that Dennison should recover for damage to the door of his residence. There was no evidence that Dennison was ever required to pay for such damage or of the value of the door.

█ In spite of the lack of proof of economic loss, the unconstitutional entry of Dennison's home and the taking of his child without due process are invasions of substantive rights entitled to damages for plaintiff's dignatory loss. *See Herrara v. Valentine,* 653 F.2d 1220 (8th Cir.1981). The testimony of both plaintiff and defendants showed that defendant's unconstitutional actions were very upsetting. A person has a great expectation of privacy while sleeping in his own bedroom in the middle of the night. The intrusion of such an interest is significant, and plaintiff's testimony demonstrated the sense of personal

---

9. In his post-trial brief plaintiff mentions liability for negligence. The complaint states no independent cause of action for negligence. Although several allegations mention negligence as well as intentional conduct, these do not amount to a claim for negligence. Moreover, plaintiff's only damages are in the nature of emotional distress, and Minnesota generally does not recognize a separate cause of action for negligent infliction of emotional distress. *See Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26 (Minn.1982). Plaintiff's claims for emotional distress are fully considered and compensated as part of his other claims.

Counsel for Randolph indicated at trial that his cross-claim for contribution was asserted in the event the court found plaintiff should recover for negligence; it is therefore presently moot.

10. Dennison argues that by stopping him at the door, Vietch violated his rights under the Fourth and Fourteenth Amendments, but Vietch's conduct in this regard was reasonable and violated no constitutional rights.

violation and emotional trauma he experienced. Also evident from the trial was plaintiff's distress over the taking of his child in the middle of the night and his continued anxiety and anger the following day. These facts would justify a significant damage award.

On the other hand, the evidence showed that plaintiff's distress was not permanent. The only lasting effect to which he could testify was his sense of disrespect and distrust of the police. Evidence in the case suggests this existed to some extent before June of 1979. In addition, Dennison had had numerous confrontations with the police before, and his distress was less severe than that of a person similarly victimized but unaccustomed to confrontation with the police. Finally, a custody hearing was held after the taking so the deprivation of plaintiff's due process rights was not of a continuing nature.

Considering these various factors, the court finds that a fair compensation for plaintiff's injuries is $1,500 for unreasonable entry into plaintiff's home, and $500 for the temporary deprivation of custody of plaintiff's child until a hearing could be held.

Plaintiff also requests punitive damages. Punitive damages may only be awarded in a § 1983 action where defendants acted with "oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of the plaintiff." *Pellowski v. Burke,* 686 F.2d 631, 634–635 (8th Cir.1982) (quoting *Guzman v. Western State Bank of Devils Lake,* 540 F.2d 948, 953 (8th Cir.1976)). Although defendants' actions were wrongful and the intrusion occurred in the middle of the night, defendants were not abusive, they maintained a relatively disinterested demeanor, and they kept their intrusion to a minimum length. While it may be a close question, the court finds on balance that defendant's actions do not justify an award of punitive damages.

Plaintiff's request for injunctive relief appears moot insofar as he no longer lives in Pine County and has offered no evidence he would travel there but for the absence of an injunction. Moreover, as noted before, there has been no showing of any unconstitutional policies, practices, or procedures to suggest a basis for a continuing constitutional violation.

Because of the above resolutions, it is unnecessary to reach the other issues raised by the parties.

## ORDER

Accordingly, based upon the foregoing,

IT IS HEREBY ORDERED:

1. That defendants Vietch and Randolph are each liable to plaintiff in the amount of $750 for the injuries caused plaintiff by their unconstitutional entry into plaintiff's home on June 8, 1978.

2. That defendants Vietch and Randolph are each liable to plaintiff in the amount of $250 for the injuries caused plaintiff by their unconstitutional deprivation of plaintiff's custody of his child without due process of law on June 8, 1978.

3. That plaintiff is entitled to judgment in the amount of $2,000 and that judgment should be entered against defendants Vietch and Randolph individually in the amount of $1,000 each.

4. That all other claims are dismissed.

5. That any application for attorney's fees must be made pursuant to Local Rule 4 D and with necessary supporting documentation.

LET JUDGMENT BE ENTERED ACCORDINGLY.