Kenneth L. ELWOOD, et al., Respondents,

v.

COUNTY OF RICE, et al., Respondents,

Stanley Pacolt, et al., Appellants.

No. CX-87-1597.

Supreme Court of Minnesota.

May 6, 1988.

Mark J. Condon, Jon K. Iverson, Minneapolis, for Stanley Pacolt, et al.

David L. Einhaus, Owatonna, for Kenneth Elwood.

James R. Keating, Faribault, for Rice County et al.

Heard, considered and decided by the court en banc.

POPOVICH, Justice.

This case arrives on the certified question restated essentially as follows: Should a peace officer who is acting within qualified immunity for purposes of an action under 42 U.S.C. § 1983 be granted the same qualified immunity from liability for state tort actions alleging trespass and battery?

The case stems from a domestic dispute investigation by two Rice County deputy sheriffs. Plaintiffs sued the officers, alleging assault, battery, trespass, false arrest and false imprisonment, intentional infliction of emotional distress, and deprivation of constitutional rights under 42 U.S.C. § 1983. After discovery, the trial court granted summary judgment for defendants on all state claims except trespass and one battery claim, and also found the deputies had qualified immunity from suit on the Section 1983 claims. Uncertain about the status of the two surviving tort claims, the court certified the above question as important and doubtful pursuant to Rule 103.-03(h), Minn.R.Civ.App.P. Plaintiffs appealed the underlying Section 1983 immunity decision as well as the judgment against them on their other state claims. We find (1) defendants are entitled to qualified immunity on the Section 1983 claim; (2) the federal immunity doctrine does not control state common law claims, but defendants in this case are nevertheless entitled to immunity under state law on the two remaining claims; and (3) the trial court properly granted judgment for defendants on the other tort claims.

I.

Plaintiffs are Sandra and Kenneth Elwood, whose son Clifford was involved in a domestic dispute with his ex-wife, Shirley Parkos Elwood. Clifford and Shirley married and divorced twice. After the second divorce in March 1983, Clifford still hoped to reconcile with Shirley and often spent nights at her house. During the week before October 27, 1983, Shirley claims Clifford physically abused and threatened her, at one point forcing her to submit to sexual intercourse by holding a knife to her neck.

On October 27, 1983, Shirley obtained an ex parte temporary order for protection, which provided that Clifford be "excluded from the premises of Petitioner's household" and "restrained from committing acts of domestic abuse against Petitioner, or anyone else, minor or adult, living in Petitioner's household." Rice County Deputy Sheriff Barry Hendrickson served the order on Clifford at work that afternoon. Clifford told Hendrickson he had plans to take the children to a movie that night, and Hendrickson advised him to have someone else telephone Shirley, or to call her but "just to get the business taken care of and then leave her alone."

That evening, Shirley and the children went to Shirley's parents' house, fearing Clifford's reaction to the order. Clifford called her there and urged her to meet and talk with him. According to Shirley, he said he had a gun in his car and if she refused to meet him he would come to her parents' house and "he didn't know what would happen if he had to come up there." While on the phone, Shirley wrote a note to her mother, asking her to call the sheriff. Mrs. Parkos did so, and told the dispatcher Clifford had a gun, had threatened Shirley with it twice before, and at that moment was threatening himself.

Deputy Hendrickson, who had served the protective order, got the call and drove to the Parkos residence to find Shirley still on

the phone with Clifford. While one of the children took the phone, Shirley explained to Hendrickson that Clifford was at his parents' home. According to Hendrickson, Shirley said Clifford had told her that if she wouldn't see him "it would be all over with." She wasn't sure if Clifford meant the relationship, his own life, Shirley's life, or her family's life. Shirley also told Hendrickson that Clifford had threatened suicide earlier in the week and he carried a gun in his car. Deputy Sheriff Stanley Pacolt arrived as a backup, and Shirley told him essentially the same story.

After instructing Shirley and her mother to keep Clifford on the phone, the officers left for the Elwood residence. They pulled into the Elwoods' driveway with their lights off. They then walked around the south side of the house, where through a window Officer Hendrickson saw a woman sitting at the kitchen table. Proceeding to the door, Officer Pacolt saw a man through a curtained window and knocked. Plaintiff Kenneth Elwood opened the door about one foot and said, "What can I do for you?"

At this point, according to Kenneth, Pacolt burst through the door, shoved Kenneth against the wall, and told him to "shut up and just stay out of it." Kenneth claims the officers offered no identification or explanation, but the officers claim they said there was a problem with Clifford and Kenneth invited them in. Pacolt walked swiftly toward Clifford, who was talking on the phone across the kitchen. Pacolt was carrying a shotgun in one hand, but handed it back to Hendrickson standing near Kenneth. Kenneth tried to step away from the wall, saying, "What's going on?" but Hendrickson allegedly shoved him back. Hendrickson claims he simply held up his hand to stop Kenneth from coming up behind Officer Pacolt. Sandra Elwood also claims she stood up when Pacolt entered and he told her to "sit down and stay there."

Pacolt told Clifford to hang up the phone and, after two or three requests, Clifford complied. An argument ensued about whether the protective order barred phone calls. Neither the deputies nor Clifford had a copy of the order, and Pacolt's calls to the county attorney and judge who signed the order brought no answers. Hendrickson told Kenneth he was free to go, and the situation eventually calmed down. Not being sure that Clifford violated the protective order, the officers made no arrests and left.

## II.

Though the certified question goes to the scope of Section 1983 qualified immunity, plaintiffs appeal the immunity ruling on which the question rests. That issue is central to the case and we address it first.

Qualified or "good faith" immunity is an affirmative defense available to public officials sued for damages under 42 U.S.C. § 1983. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). The United States Supreme Court recognized the doctrine in *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), where it permitted police officers to raise a "good faith" defense in a Section 1983 action. The court later extended that decision to high-ranking state executives, and implied that the immunity analysis included both objective and subjective factors. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Soon after *Scheuer,* the Court explicitly adopted a two-factor test, whereby the immunity defense failed if officials either knew or reasonably should have known their action violated plaintiffs' clearly established constitutional rights *or* if they maliciously intended that result. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

Then in *Harlow v. Fitzgerald,* the Court restructured the standard to eliminate the subjective component. *Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737–38. Subjective "good faith," the Court noted, is usually a fact question for the jury, while the purpose of immunity is to protect government officials from the burdens of discovery and trial. *Id.* The test for immunity became whether the officials' conduct violated "clearly established statutory or constitutional rights of which a reason-

able person would have known." *Id.* at 818, 102 S.Ct. at 2738.[1] *See generally,* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126 (1985). After *Harlow,* it is clear immunity is a purely legal question conceptually distinct from a defense to the merits of plaintiffs' claim. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). An order denying immunity is immediately appealable. *Id.; Anderson v. City of Hopkins,* 393 N.W.2d 363, 364 (Minn.1986).

The Court applied the *Harlow* test to police officers in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), stressing objective reasonableness as the guiding principle. Under *Malley,* the "good faith" inquiry is confined to the question "whether a reasonably well-trained officer would have known" the act was illegal. *Malley,* 475 U.S. at 344, 106 S.Ct. at 1098, citing *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). Immunity should be recognized "if officers of reasonable competence could disagree on this issue." *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096.

Most recently, the Court further explained the *Harlow* and *Malley* analysis, rejecting the Eighth Circuit Court of Appeals' view that immunity should be denied simply because the right allegedly violated was clearly established. *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Anderson,* state and federal law enforcement officers conducted a warrantless search of plaintiffs' house on the mistaken belief that a bank robbery suspect might be found there. The court of appeals found the officers were not entitled to qualified immunity because plaintiffs' rights under the Fourth Amendment were clearly established at the time of the incident. *Creighton v. City of St. Paul,* 766 F.2d 1269, 1277 (8th Cir. 1985).

The Supreme Court reversed and remanded, noting that most constitutional rights are clearly established at some level. The issue, rather, is whether the contours of the right are sufficiently clear that a reasonable official would understand he is violating that right. *Anderson,* 107 S.Ct. at 3038–39. In the context of an allegedly unreasonable search, the analysis will often require examination of the information possessed by the searching officials. *Id.* at 3040. The relevant question, then, "is the objective (albeit fact-specific) question whether a reasonable officer would have believed [defendant's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.* At the same time, the Court reiterated that "insubstantial claims" against government officials should be resolved on summary judgment, calling that objective the "driving force behind *Harlow*'s substantial reformulation of qualified immunity principles." *Id.* at 3039, n. 2.

Two preliminary matters bear mention. This case proceeded through discovery, though it is now clear that qualified immunity questions should be resolved at the earliest possible stage to shield officers from disruptive effects of broad-ranging discovery and effects of litigation. *Anderson,* 107 S.Ct. at 3042, n. 6. Dismissal prior to discovery is proper if the actions plaintiffs allege are those a reasonable officer could have believed lawful. *Id.* We nevertheless consider the question on the record developed in this case.

Also, while we find defendants are entitled to qualified immunity on the record here, we note that defendants contend the complaint is insufficiently specific because it simply alleges deprivation of rights without citing particular constitutional provisions. Such imprecision, while not condoned, is not fatal if the facts alleged state a claim. *Henry v. City of Minneapolis,* 512 F.Supp. 293, 295 (D.Minn.1981). We

---

1. *Harlow* was a suit against federal officials as sanctioned in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but the Court explicitly applied the immunity standard to suits against state officials under Section 1983. *Harlow,* 457 U.S. at 818, n. 30, 102 S.Ct. at 2738, n. 30.

observe, however, that the goal of protecting public official defendants from the burden of "broad ranging discovery" is somewhat contrary to traditional pleading standards. *See Martin v. Malhoyt,* 830 F.2d 237, 256–57 (D.C.Cir.1987). Plaintiffs cannot expect discovery to provide factual support for conclusory allegations against public officials in Section 1983 suits, and therefore should supply in their complaints or other supporting materials greater factual specificity and "particularity" than is usually required. *Id.*

■ Here, plaintiffs' Section 1983 claim rests on allegations that the Rice County deputies conducted a nonconsensual, warrantless entry into the Elwood home without exigent circumstances, violating plaintiffs' rights under the Fourth Amendment. Indisputably, those rights are well established. *See Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980). The issue is whether a reasonably well-trained officer could have found exigent circumstances to justify the entry alleged, based on the information available to Deputies Hendrickson and Pacolt. In determining whether exigent circumstances could exist, we consider the totality of the circumstances surrounding the entry. *State v. Lohnes,* 344 N.W.2d 605, 611 (Minn.1984). Emergency situations, such as the need to protect or preserve life or avoid serious injury, can justify police conduct that would otherwise be unlawful. *State v. Terrell,* 283 N.W.2d 529, 532 (Minn.1979); *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

■ The information available to the deputies before entering the Elwoods' home is substantially undisputed. Deputy Hendrickson received a call from the dispatcher about a "possible suicide." Shirley Elwood told both officers Clifford had access to a gun and was possibly threatening himself as well as her. Though the parties differ on the precise wording of Clifford's threats, Shirley clearly communicated fear that a violent reaction to the protective order was imminent. Having served the order himself, Deputy Hendrickson had the opportunity to assess Clifford's behavior late that afternoon. On arrival at the Elwood residence, the officers could not confirm where Clifford was or if he had a gun. And though Kenneth Elwood gave no indication of danger when he answered the door, we think a reasonable officer could believe the situation called for a rapid entry to investigate the possibility of suicide or injury. Given the volatility of domestic disputes, we are reluctant to second-guess the officers' judgment on these facts; at the very least, officers of reasonable competence could have disagreed about the proper response. *See Myers v. Morris,* 810 F.2d 1437, 1457 (8th Cir.1987).

The trial court grounded its decision on the affidavit of Donald Peterson, Director of Police Training for the Minnesota Bureau of Criminal Apprehension. Peterson opined that the deputies' actions were in all respects "appropriate and proper police procedure." The court initially found the affidavit flawed for purposes of summary judgment because it resolved controverted factual issues. However, the court found uncontradicted evidence of the officers' reasonableness after Peterson, in a supplementary affidavit, repeated his opinion but "assumed as true all facts available to the deputies at the time they knocked on the Elwood door," and also accepted "plaintiff's version of the facts from the instant Kenneth Elwood said, 'What can I do for you?'" The affidavit obviously supports defendants' position, though it does not, in our view, determine objective reasonableness as a matter of law. Even without the Peterson affidavit, we are persuaded that reasonable officers could believe the warrantless entry and momentary restraints on Sandra and Kenneth Elwood were justified by these exigent circumstances. The deputies are therefore entitled to qualified immunity from liability under Section 1983.

### III.

■ The trial court granted judgment for defendants on the Section 1983 claim but let stand two of plaintiffs' state tort claims. Addressing the certified question, defendants urge that qualified immunity

for purposes of Section 1983 also applies to state law claims. We disagree, rejecting the proposition that federal immunity principles under Section 1983 also control state law. While qualified immunity under Section 1983 had its origin in public officials' defenses available at common law, the doctrine has since been "completely reformulated * * * along principles not at all embodied in the common law." *Anderson*, 107 S.Ct. at 3041; *see also* Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark.L.Rev. 741, 745–57 (1987). We decline to simply apply the federal standard in all state tort actions.

We have previously recognized the distinction between state and federal standards of official immunity. In *Finch v. Wemlinger*, 310 N.W.2d 66 (Minn.1981), we rejected the suggestion that Minnesota law controls the immunity question in a Section 1983 action. Rather, we observed that Congress did not intend to apply 50 different standards of immunity when state courts exercise jurisdiction over Section 1983 claims. *Id.* at 69–70. Nothing in *Finch*, though, implied that federal law supplants the Minnesota doctrine of official immunity in state law claims. Nor do we think that course is appropriate, as "qualified immunity" is a doctrine that continues to evolve in the unique context of Section 1983. The common law of official immunity retains an independent vitality in state tort actions. *See Finch*, 310 N.W.2d at 69, n. 3.

While the trial court correctly denied the deputies "Section 1983 qualified immunity" from state tort claims, it failed to analyze the same question under Minnesota law. Under that law, we find the deputies have official immunity on the facts of this case.

■ The official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976); *see also Johnson v. Steele County*, 240 Minn. 154,

164, 60 N.W.2d 32, 39 (1953). The distinction between "discretionary" and "ministerial" duties has been subject to "enigmatic application and occasional breakdown." *Papenhausen v. Schoen*, 268 N.W.2d 565, 571 (Minn.1978). Nevertheless, some basic principles emerge from the cases.

In *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937), this court explained that "[o]fficial duty is ministerial when it is absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." Applying this principle, state employees did not perform a discretionary act when they removed an abandoned house with a tractor in *Williamson v. Cain*, 310 Minn. 59, 61, 245 N.W.2d 242, 244 (1976). Their job was "simple and direct—to remove a house," and the "nature, quality and complexity of their decision-making process" did not entitle them to immunity. *Id.* On the other hand, the commissioner of corrections and a prison warden had discretionary duties in supervising the prison industries program, insulating those officials from liability for a negligence claim arising from a prison factory incident. *Susla*, 311 Minn. at 175, 247 N.W.2d at 912. Similarly, members of a parole board exercised discretionary duties when they transferred a patient to a medium-security facility from which the patient escaped. *Papenhausen*, 268 N.W.2d at 571–72. Each board member evaluated a body of data and made "a discretionary judgment based on that evaluation." *Id.*

■ Some degree of judgment or discretion will not necessarily confer discretionary immunity on an official; the crucial focus is upon the nature of the act. *Larson v. Independent School Dist. No. 314, Braham*, 289 N.W.2d 112, 120 (Minn.1979). Thus, a physical education teacher was not entitled to immunity for the simple decision regarding how to teach a gymnastic exercise, and a high school principal lost his potential immunity by entirely abdicating his responsibility to exercise discretion. *Id.* at 120–21, 125.

■ Finally, while *Larson* described the "planning level of conduct" as an ear-

mark of immunity, 289 N.W.2d at 120, we have recently stressed the importance of distinguishing between the common law immunity of a government employee and the immunity of a governmental unit under the state and municipal tort claims statutes. *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713 (Minn.1988). Both doctrines are phrased in terms of whether discretion was involved, but they are based on entirely different rationales. *Id.* Governmental immunity rests on the need to protect policymaking activities that involve a balancing of social, political or economic considerations. *Id.*, at 722. Official immunity, on the other hand, protects public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties. Restatement (Second) of Torts § 895D comment b; *Nusbaum*, 422 N.W.2d at 722. Discretion, therefore, has a broader meaning in the context of official immunity.

▮ This court has suggested, as a general matter, that police charged with the duty to prevent crime and enforce the laws are not purely "ministerial officers," in that many of their duties are of an "executive character involving the exercise of discretion." *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937), citing *Haynes v. Commonwealth*, 104 Va. 854, 52 S.E. 358 (1905). Whether an officer's conduct merits immunity nevertheless turns on the facts of each case.

▮ The deputies here responded to reports of a possibly armed man who, according to his ex-wife, was threatening both her and himself.[2] Peace officers confronting a possible crime or emergency in the home must immediately judge whether probable cause and exigent circumstances justify entry without a warrant. *See State v. Lohnes*, 344 N.W.2d 605, 611 (Minn.1984). We have long endorsed a broad standard

for probable cause, citing this explanation in *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949):

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. *The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.*

*State v. Harris*, 265 Minn. 260, 265, 121 N.W.2d 327, 331 (1963) (emphasis added in *Harris*); *see also Lundeen v. Renteria*, 302 Minn. 142, 148, 224 N.W.2d 132, 136 (1974). Similarly, we have recognized that a rigid test of exigent circumstances could lead to "an overly cautious attitude on the part of police." *Lohnes*, 344 N.W.2d at 611.

The law, in other words, calls for police in emergency situations to exercise significant independent judgment based on the facts before them. They are afforded a wide degree of discretion precisely because a more stringent standard could inhibit action. The need to protect police judgment and encourage responsible law enforcement is particularly compelling in the context of domestic disputes, which are notoriously volatile and unpredictable. The legislature, in fact, has recognized this special situation by granting peace officers immunity from civil liability when making arrests in good faith for certain domestic violations. Minn.Stat. § 629.341 (1984).[3]

---

**2.** We note that while Clifford threatened Shirley over the telephone, he was approximately three blocks from Shirley's home at the time.

**3.** Minn.Stat. § 629.341 (1984), provides in relevant part:

Subdivision 1. **Arrest.** Notwithstanding the provisions of section 629.34 or any other law

or rule to the contrary, a peace officer may arrest without a warrant a person anywhere, including at his place of residence if the peace officer has probable cause to believe the person within the preceding four hours has assaulted, threatened with a dangerous weapon, or placed in fear of immediate bodily harm his spouse, former spouse, or other person

If Deputies Hendrickson and Pacolt had arrested Clifford Elwood, the statute alone would arguably protect them from liability, though we need not decide that question here. We find that the deputies, in deciding to enter the Elwood home and momentarily restrain plaintiffs, exercised the kind of judgment meant to be protected by official immunity.

Other states have reached similar conclusions. In Missouri, police officers were protected by official immunity when they answered a call about a man threatening others with a rifle, kicked in the man's door, and exchanged gunfire that wounded plaintiff bystanders. *Green v. Denison*, 738 S.W.2d 861 (Mo.1987). Plaintiffs' expert criticized the police action as too hurried, but the court noted that an alerted or irrational defendant might have fired his weapon before the officers could initiate a conversation. *Id.* at 866. The situation was "teeming with the necessity for quick judgment calls," and the doctrine of official immunity was established to protect public officials from just the kind of second-guessing plaintiffs urged. *Id.* Police have likewise been found immune from suit when they chose to wait for backup assistance rather than immediately interrupt a fight. *Ross v. Consumers Power Co.*, 420 Mich. 567, 363 N.W.2d 641, 678–80 (1984). The *Ross* court stressed that police faced with a potentially dangerous situation "must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers." *Id.* 363 N.W.2d at 679.

Discretionary conduct is clearly *not* protected if the official committed a willful or malicious wrong. *Susla*, 247 N.W.2d at 912. The doctrine protects honest law enforcement efforts, and is not intended to shield police brutality. While this point may raise a fact question for the jury, we find no such genuine issue here. Viewing the facts in the light most favorable to plaintiffs' position, no reasonable jury could find the deputies acted with bad faith or malicious intent. Nothing in plaintiffs' version of the incident suggests other than an honest law enforcement effort by peace officers faced with uncertain circumstances. The deputies' conduct focused on Clifford, and they left when they were satisfied he was under control. At worst, the record indicates overzealous investigation by peace officers who reasonably, if mistakenly, believed their action was necessary to prevent suicide or random violence arising from a domestic dispute. In these circumstances, the deputies deserve summary judgment on the trespass and battery claims based on official immunity.

Rice County, while a named defendant, was not substantially involved in this appeal. Plaintiffs did not brief any theory of county liability or the application of Minn. Stat.Ch. 466. The county by letter merely joined in the officers' brief. Given this state of the record further proceedings, if any, are left for the trial court on remand.

### IV.

▆▆▆▆ The trial court dismissed plaintiffs' other tort claims on the merits. We affirm. There is no allegation or evidence on file that either deputy touched Sandra Elwood, so her battery claims fails. Nor does either plaintiff present a triable claim for assault, which requires an unlawful threat to do bodily harm to another with present ability to effect that threat. *Dahlin v. Fraser*, 206 Minn. 476, 478, 288 N.W. 851, 852 (1939). Plaintiffs concede the deputies never pointed the shotgun at them or threatened them with it, and words alone do not constitute assault. *Id.* As to false arrest or imprisonment, the trial court properly noted the record shows not confinement but "a very brief restraint of the right of the Plaintiffs to go to their son." *See Dennison v. Vietch*, 560 F.Supp. 435, 443 (D.Minn.1983). Also, nothing alleged constitutes extreme and outrageous conduct supporting a claim for intentional or

---

with whom he resides or has formerly resided, although the assault did not take place in the presence of the peace officer.

Subd. 2. **Immunity.** Any peace officer acting in good faith and exercising due care in the making of an arrest pursuant to subdivision 1 shall have immunity from civil liability that otherwise might result by reason of his action.

reckless infliction of emotional distress. *See Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn. 1983).

Certified question answered; remanded for proceedings consistent with this opinion.