**William CARTER, III, Appellant,**

v.

**PEACE OFFICERS STANDARDS AND TRAINING BOARD, et al., Respondents.**

No. C2–95–2319.

Court of Appeals of Minnesota.

May 14, 1996.

Review Granted July 10, 1996.

---

Stephen W. Cooper, Kathryn J. Cima, The Cooper Law Firm, Minneapolis, for Appellant.

Richard A. Beens, Lee A. Lastovich, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for Respondents.

Considered and decided by LANSING, P.J., and KLAPHAKE and MULALLY, JJ.*

## OPINION

KLAPHAKE, Judge.

■ Appellant William Carter III brought this action against his former employer, respondent Minnesota Board of Peace Officer Standards and Training (Board), and respondent Richard Stanek, individually and in his official capacity as Board Chair. Carter alleged violation of the Minnesota Whistleblower Act, Minn.Stat. §§ 181.931–.935 (1992); unlawful "reprisals" and "aiding and abetting" in violation of the Minnesota Human Rights Act, Minn.Stat. §§ 363.01–.15 (1992 & Supp.1993); infringement of free speech, due process, and equal protection in violation of 42 U.S.C. § 1983; tortious interference with contract; defamation; and noncompliance with the Minnesota Open Meeting Law, Minn.Stat. § 471.705 (1992).[1]

After the parties engaged in extensive discovery, the district court granted the Board and Stanek's motion for summary judgment on all claims.[2] Because we conclude that the Board is entitled to discretionary function

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. The district court granted the Board and Stanek summary judgment on the open meeting claim. On appeal, Carter does not address or brief this issue. We therefore deem it waived. See Balder v. Haley, 399 N.W.2d 77, 80 (Minn. 1987) (issues not argued in briefs "must be deemed waived" on appeal unless as the interests of justice may require).

2. While the district court also granted Carter's motion to amend his complaint to add a claim for punitive damages against Stanek, it indicated that its decision to grant leave to amend was mooted by its grant of summary judgment on Carter's other claims and its dismissal of his complaint. The Board and Stanek have not filed a notice of review challenging the district court's ruling on Carter's motion to amend. We therefore decline to address this ruling on appeal.

immunity and that the Board is unamenable to suit under 42 U.S.C. § 1983, we affirm the district court's grant of summary judgment for the Board on Carter's whistleblower, human rights, and § 1983 claims. Because we conclude that Stanek is not entitled to common law official immunity, we reverse the grant of summary judgment on Carter's whistleblower claim against Stanek individually. Finally, because we conclude Carter has presented sufficient facts to withstand summary judgment, we reverse the grant of summary judgment on his claims of defamation and tortious interference with contract.

## FACTS

The Board is a creature of legislative enactment and reports directly to both the governor and the legislature. It is charged with the responsibility of establishing policies and procedures applicable to law enforcement throughout the state. The governor selects the Board's chair and appoints fourteen of its fifteen members. Minn.Stat. §§ 626.841, .843 (1992). Stanek was appointed by the governor to serve as chair from 1991 to the fall of 1994.

Carter was hired by the Board to serve as its executive director from 1987 until his termination on September 1, 1993. In that capacity, Carter was an at-will employee who served "at the pleasure of the board" and performed "such duties, on behalf of the board, as the board * * * prescribe[d]." Minn.Stat. § 626.843, subd. 2. Carter reported to the Board and represented the Board at various functions. On behalf of the Board, Carter lobbied the legislature, served as spokesperson, and managed staff. His responsibilities included implementing Board policy and balancing the competing interests of the Board's constituencies, such as the individual police officers, chiefs of police and sheriffs, state legislators, and law enforcement higher education facilities.

In June and July 1993, Carter received allegations of inappropriate conduct on the part of trainers during Board-approved training sessions.[3] One incident involved a St. Paul Police Department trainer who allegedly engaged in psychological intimidation of trainees. In response to a letter from Carter, the Department informed Carter that it did not believe the Board had authority or jurisdiction to investigate this incident. The second incident involved a session put on by the Minnesota Police Chiefs' Association (Association) during which the keynote speaker allegedly told sexist, racist, and homophobic jokes. Carter notified the Association of the incident, and the Association made some changes to the written materials it handed out at seminars.

During July 1993, Carter also was investigating complaints against several police chiefs who allegedly were not following a law regarding the use of force and deadly force.[4] One complaint involved Mankato Police Chief Glen Gabriel, who agreed that he was not in compliance with the law. Gabriel acknowledged that sometime in August 1993, Stanek telephoned him, told him not to worry about the investigation, and said he "would take care of it." Gabriel later speculated that Stanek was referring to the fact that Carter was going to be terminated.

Richfield Police Chief Jack Erskine was also the subject of a complaint and investigation. He and other police chiefs were openly hostile to these investigations. On August 24, 1993, Erskine organized a meeting of approximately 50 other police chiefs, apparently to discuss the investigations and complain about the Board's involvement in their internal affairs. Board staff were not allowed to attend this meeting.

The following day, Stanek and Board Vice Chair Thomas Steininger met with Carter and demanded that he resign or be terminated. Carter recalled that Stanek raised con-

---

**3.** One of the Board's responsibilities is to certify training programs for police officers and trainers. Minn.Stat. § 626.843, subd. 1.

**4.** In 1991, the legislature enacted a statute requiring the head of every local and state law enforcement agency to adopt and enforce a written policy governing the use of force, including deadly force, and the use of firearms by police officers. 1991 Minn. Laws ch. 141, § 2; Minn. Stat. § 626.8452 (1992). The Board was given the authority to impose licensing sanctions and seek injunctive relief for failure to comply with this statute. Minn.Stat. § 626.8452, subd. 5.

cerns about the police chiefs' meeting and about the Erskine investigation. Stanek later acknowledged that he asked for Carter's resignation in part because of Erskine and the other police chiefs' anger over the Board's investigations.

On September 1, 1993, Stanek called an emergency Board meeting. Carter claims that Stanek misrepresented to Board members that Stanek had invited Carter to attend the meeting and that Carter had agreed to resign. Carter insists that he was never invited to attend the meeting, that Stanek suggested he be on vacation, and that he never agreed to resign. Stanek claims that Carter was aware of the date and time of the meeting, drew up the agenda, and chose not to attend the meeting.

After extensive discussion at the emergency meeting, the Board voted 13 to 1 to remove Carter from his position as executive director. Several Board members acknowledged that their decision was based in part on the police chiefs' recent meeting. Several Board members also interpreted Carter's absence at the Board meeting as an indication that he either agreed to resign or had no defense to Stanek's stated reasons for his termination. The Board's action gave Carter the option to "bump" into his previous position as "Standards Coordinator," but he elected to quit rather than return to his old position.

After Carter quit, Stanek made public statements that Carter had been fired for mismanagement. In a November 1993 newspaper article, Stanek was quoted as stating that Carter's firing was "based on performance and managerial problems."

Carter insists that he received only positive feedback on his work performance until Stanek asked for his resignation in August 1993. Both the Board and Stanek disagree with Carter's portrayal of his performance during his tenure as executive director. While they agree that Carter's technical skills were good and that he "worked hard," they insist that he was unable to establish the necessary level of credibility to work effectively with the Board's various constituencies. They further claim that Carter was perceived as being "too close" to the higher education constituency at the expense of law enforcement and that he tended to follow his own political agenda instead of acting in the Board's interests. They finally claim that Carter was unable to effectively manage internal Board responsibilities such as staffing and funding.

Carter was replaced by Ray Cummings, who had been the executive director of the Association. With respect to the investigations begun by Carter, the Board eventually found Erskine in violation of the law but took no action. The Board also found Gabriel in noncompliance with the law and gave him 30 days to change his department's policy.

## ISSUE

Did the district court err in granting the Board and Stanek summary judgment on all of Carter's claims?

## ANALYSIS

■ Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that one party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. To survive a motion for summary judgment, the nonmoving party "may not rest upon the mere averments or denials of [its] pleadings but must present specific facts showing that there is a genuine issue for trial." Minn. R. Civ. P. 56.05. On appeal, this court must view the evidence in the light most favorable to the party against whom judgment was granted and must accept as true the factual allegations made by that party. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).

The district court determined that the Board and Stanek were entitled to statutory discretionary, official, or qualified immunity with respect to the decision to terminate Carter, an unclassified employee who served at the Board's pleasure. The court further determined that even if the Board and Stanek were not entitled to immunity, summary judgment was nevertheless appropriate because Carter failed to present prima facie cases on each of his claims.

At common law, the doctrine of sovereign immunity generally prevented suits against

the state without its consent. *Rico v. State*, 472 N.W.2d 100, 104 (Minn.1991). With the passage of the Tort Claims Act in 1976, the Minnesota Legislature waived the state's immunity and created a general rule of liability under circumstances "where the state, if a private person, would be liable to the claimant." Minn.Stat. § 3.736, subd. 1 (1992). This waiver of immunity is subject to the discretionary function exception, which protects "the state and its employees"[5] from liability for "a loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." *Id.*, subd. 3(b).

▪ A state employee sued individually may be liable unless entitled to protection under the common law doctrine of official immunity. *Rico*, 472 N.W.2d at 106 n. 4. That doctrine provides that a public official
> charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.

*Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988) (quoting *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)).

▪ Although the doctrines of statutory discretionary and common law official immunity both protect discretionary acts, the types of acts covered by the doctrines are not identical. *Rico*, 472 N.W.2d at 107. The purposes of the two doctrines differ: statutory discretionary immunity is "designed to preserve the separation of power," whereas common law official immunity is "intended to insure that the threat of potential personal liability does not unduly inhibit the exercise of discretion required of public officials in the discharge of their duties." *Holmquist v. State*, 425 N.W.2d 230, 233 n. 1 (Minn.1988). Discretion thus has a broader meaning in the context of official immunity. *Elwood*, 423 N.W.2d at 678.

▪ Statutory discretionary immunity protects planning level decisions involving questions of public policy and the balancing of competing policy objectives which may be political, economic, or social in nature. *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 719–20, 722 (Minn.1988). Common law official immunity protects individual acts involving the exercise of judgment or discretion, but not acts performed on a ministerial or implementation level. *Rico*, 472 N.W.2d at 107. In addition, official immunity does not protect a public employee who commits a willful or malicious wrong, or who otherwise willfully violates a known right. *Id.*

**Whistleblower Act**

▪ Carter alleges that the Board and Stanek in his official capacity violated the Whistleblower Act, Minn.Stat. § 181.932. The Board's decision to discharge Carter involved the balancing of political, social, and economic factors comprising a discretionary choice between alternatives. The decision was thus inextricably involved with the Board's responsibility to formulate policies and procedures applicable to law enforcement throughout the state. The Board is therefore entitled to discretionary function immunity for its decision to terminate Carter from his position as its executive director. *See Rico*, 472 N.W.2d at 106 (decision to remove unclassified policy-making employee protected by discretionary function exception).

▪ Carter also alleges that Stanek individually violated the Whistleblower Act. This court recently held that official immunity does not apply to whistleblower claims. *Janklow v. Minnesota Bd. of Examiners for Nursing Home Adm'rs*, 536 N.W.2d 20, 24 (Minn.App.1995), *review granted* (Minn. Oct. 27, 1995). Accordingly, Stanek is not protected by official immunity from Carter's whistleblower claim.

▪ Even if the supreme court concludes that official immunity is available in a whistleblower action and reverses *Janklow*, Stanek is not necessarily entitled to the protection of official immunity. Material issues of

**5.** "State" includes boards, agencies, and individual officers thereof; "employee of the state" includes "persons acting on behalf of the state in an official capacity * * * with or without compensation." Minn.Stat. § 3.732, subd. 1(1), (2) (Supp.1993).

fact exist as to whether Stanek committed a malicious or willful wrong because he knew or should have known that his conduct was prohibited by the Whistleblower Act. An individual is not entitled to summary judgment official immunity under such circumstances. *See Rico*, 472 N.W.2d at 107.

We further conclude that Carter has alleged facts sufficient to withstand summary judgment on his whistleblower claim against Stanek. Carter established that he reported law violations to the Board and that, at the Board's direction, he participated in investigations or raised concerns of deadly force policy violations by police chiefs. *See* Minn. Stat. § 181.932, subd. 1(a), (b) (act prohibits adverse employment actions against employee because employee reports law violation or because employee "is requested by a public body or office to participate in an investigation, hearing or inquiry"); *Janklow*, 536 N.W.2d at 22–23 (executive director of regulatory board raised genuine issue of fact that he was fired for investigating and reporting violations of state law). Carter further provided sufficient evidence to raise a fact issue on the causal connection between his termination and his investigations or reports of illegal activity. That evidence included: Stanek's admission that Carter's termination was based in part on the police chiefs and Erskine's anger at Carter; Stanek's representation to Gabriel that he would "take care of" the investigation against Gabriel; Stanek's request for Carter's resignation one day after the police chiefs met to discuss Carter's investigations; the Board's replacement of Carter with the executive director of the Association; and the Board's subsequent findings that Erskine and Gabriel had violated the law. Carter thus established a prima facie case of retaliation by showing that his discharge was motivated by an impermissible reason. *See McGrath v. TCF Bank Sav.*, 502 N.W.2d 801, 806–07 (Minn.App.1993), *aff'd as modified*, 509 N.W.2d 365 (Minn.1993).

While Stanek offers nonretaliatory reasons for Carter's termination, including Carter's poor management skills and unresponsiveness to the Board, these reasons merely establish the possibility of a mixed-motive for Carter's termination. *See id.* (citing *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 624 (Minn.1988)). At trial, Carter must convince the trier of fact that his investigations and reports of illegal activities formed a discernible and causative factor for his termination and that Stanek's claimed reasons were pretextual. *See id.* at 807.

### Human Rights Act

Carter alleges a "reprisal" claim against the Board and an "aiding and abetting" claim against Stanek under the Minnesota Human Rights Act. *See* Minn.Stat. § 363.03, subd. 7 (elements of reprisal claim are protected conduct, adverse employment action, and causal connection). Governmental entities and officials may claim immunity from Human Rights Act claims. *State v. City of Mounds View*, 518 N.W.2d at 571. We believe that the Board's decision to terminate Carter, an unclassified policymaking employee, involved a balancing of policy considerations. *See Rico*, 472 N.W.2d at 105–06 (state's decision to terminate unclassified, policymaking member of commissioner's management team challenges development and implementation of policy and is entitled to discretionary function immunity). Consequently, the Board and Stanek in his official capacity are entitled to statutory discretionary immunity on this claim.[6]

Even if the Board and Stanek were not entitled to immunity, we conclude that summary judgment was properly granted on this claim because we do not believe that Carter has presented sufficient facts to establish that Stanek's decision to terminate him was made in reprisal for conduct protected by the Human Rights Act. Carter claims that the protected conduct[7] involved com-

---

6. We need not decide whether Stanek is entitled to official immunity with respect to any human rights claim Carter might make against Stanek in his individual capacity, because we conclude that Carter failed to present sufficient facts to establish such a claim.

7. Carter also claims that he engaged in protected conduct with respect to the position he took on the recruitment of minorities and women in law enforcement. There is no evidence that he opposed a practice forbidden by the Human Rights Act or otherwise participated in a proceeding under the Act with respect to his position on the

plaints he made about discrimination and harassment during training sessions, and that causation is shown by the proximity in time between the complaints and his termination. Carter's "complaints," however, are more accurately characterized as "issues" or "concerns" about incidents during Board-approved training. Carter raised these concerns in letters to the St. Paul Police Department and the Association. Carter did not oppose a "practice forbidden under [the Human Rights Act]," or otherwise file a charge, testify, assist, or participate in an investigation, proceeding, or hearing under the Act. *See* Minn.Stat. § 363.03, subd. 7. Nor has Carter shown any causation between his termination by the Board and the issues he raised about possible discrimination or harassment by trainers. As such, we believe that summary judgment was properly granted on Carter's claimed violation of the Human Rights Act.

### Tortious Interference with Contract

Carter alleges that Stanek tortiously interfered with Carter's employment contract and relationship with the Board. This claim is based in part on Stanek's alleged "misrepresentations" to the Board during its September 1 meeting. Some of the Board members relied upon these statements to support their decision to terminate Carter.

 Stanek is not entitled to official immunity for making these statements, because fact issues exist as to whether he knew or should have known that his conduct was prohibited. As already discussed, a public official is not entitled to official immunity when he has committed a malicious or willful wrong. *Cf. Rico,* 472 N.W.2d at 107–08 (official immunity available to public official, even though he intentionally commits act that court or jury subsequently determines is a wrong, unless official knew or had reason to know act was proscribed or prohibited).

 In addition, Carter's allegations raise material issues of fact that Stanek interfered with his contractual relationship. *See Nordling v. Northern States Power Co.,*

478 N.W.2d 498, 505 (Minn.1991) (tortious interference claim will lie for at-will employment agreement when corporate officer acts outside of corporate duties). Carter's allegations further raise material issues of fact as to whether Stanek was acting in bad faith or motivated by "personal ill-will, spite, hostility, or a deliberate intent to harm" Carter. *See id.* at 507. Therefore, we reverse the district court's grant of summary judgment on this claim.

### 42 U.S.C. § 1983

 With respect to Carter's claim under 42 U.S.C. § 1983, the state must establish it is entitled to qualified immunity. *See Elwood,* 423 N.W.2d at 676–77 (officials entitled to qualified immunity from liability under 42 U.S.C. § 1983 are not necessarily entitled to immunity for state tort claims); *Stone v. Badgerow,* 511 N.W.2d 747, 751 (Minn.App.1994), *review denied* (Minn. Apr. 19, 1994). A board's decision to terminate an employee is afforded qualified immunity unless "a reasonable official would clearly know that a dismissal would be unlawful." *Stone,* 511 N.W.2d at 751. Because fact issues exist as to whether the Board and Stanek should have known that their conduct was prohibited by state law, we conclude they are not entitled to qualified immunity. We nevertheless believe that summary judgment was properly granted on this claim because neither a state nor its employees acting in their official capacity may be sued under § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989); *Stone,* 511 N.W.2d at 751 n. 3 (section 1983 action may not be maintained against state and its employees in their official capacity). Carter's complaint seeks judgment on this claim only against the Board, and not against Stanek individually. Thus, the district court did not err in granting summary judgment on Carter's 42 U.S.C. § 1983 claim.

### Defamation

 Stanek made public statements that Carter was fired for "performance and managerial problems." Carter claims he was dis-

---

recruitment of minorities and women. Nor is there any evidence of a causal connection be-

tween his position on this issue and his termination.

charged not for poor management, but for investigating and pursuing complaints against police chiefs. Defamatory statements may include statements that are arguably true, but made under circumstances to mislead and confuse the listener and place the target in a false and negative light. *See Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 573 (Minn.1987).

A public employer is not immune from a defamation claim when the alleged defamatory statements are made within the context of an administrative personnel matter. *Bauer v. State,* 511 N.W.2d 447, 450 (Minn.1994). High level, executive government officials are entitled to an absolute privilege. *See Johnson v. Dirkswager,* 315 N.W.2d 215, 220 (Minn.1982) (describing positions entitled to absolute immunity). Board Chair Stanek, however, was neither "high level" nor executive. Stanek may still be entitled to a qualified privilege if he can show that his statements were made on a proper occasion, from a proper motive, and based on reasonable or probable cause. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256–57 (Minn.1980). We nevertheless conclude that a fact issue exists as to whether Stanek was motivated by actual malice when he made the statements. *See Bauer,* 511 N.W.2d at 449–450 (actual malice defeats qualified privilege and is "generally" fact issue for jury). Therefore, summary judgment was inappropriate on Carter's defamation claim.

## DECISION

The district court's grant of summary judgment is affirmed with respect to Carter's claims of violation of the Human Rights Act, 42 U.S.C. § 1983, and the Whistleblower Act. The grant of summary judgment with respect to Carter's claims of violation of the Whistleblower Act against Stanek individually, tortious interference with contract, and defamation are reversed and remanded for trial.

**Affirmed in part, reversed in part, and remanded.**