Virginia **KELLY**, et al., Appellants,

Kenneth Dukes, Plaintiff,

v.

**CITY OF MINNEAPOLIS,**
et al., Respondents.

No. C0–97–1206.

Court of Appeals of Minnesota.

July 14, 1998.

Review Granted Sept. 22, 1998.

Larry E. Reed, Hassan & Reed, Ltd., Minneapolis, for appellants.

Jay M. Heffern, Minneapolis City Attorney, Edward Backstrom, Assistant City Attorney, Minneapolis, for respondents.

Considered and decided by AMUNDSON, P.J., and KLAPHAKE and SHUMAKER, JJ.

## OPINION

KLAPHAKE, Judge.

Appellants Virginia Kelly and Antoinette Deyo allege numerous trial errors in their civil action against respondents, the City of Minneapolis, the police chief, and four Minneapolis police officers. They claim error in (1) the trial court's imposition of official immunity to bar two police officers' liability for intentional infliction of emotional distress; (2) evidentiary rulings; (3) defense counsel misconduct; (4) jury instructions; (5) special verdict form; (6) court rulings on their motion for a posttrial *Schwartz* hearing; and (7) findings as contrary to the evidence on their human rights claims. Respondent City of Minneapolis filed a notice of review claiming that the trial court erred in declining to grant their motion for summary judgment on appellants' intentional infliction of emotional distress claims. Respondents also move to strike portions of appellants' brief and appendix. We affirm in part and reverse in part.

## FACTS

The parties adamantly dispute the facts of this case. At approximately 1:30 a.m. on September 29, 1991, respondent Minneapolis police officer Daniel Wells was dispatched to 2932 Humboldt Avenue North to investigate a loud party, and he was advised that "someone" was "screaming." Upon arriving there, he heard noise emanating from a party next door, at 2934 Humboldt Avenue North. Appellant Antoinette Deyo, who acknowledged that she was having a party at her house, approached him. According to Wells, when Deyo declined to identify herself, Wells decided to arrest her for a violation of the Minneapolis noise ordinance. Deyo claimed that Wells was not called to her address and that he was unresponsive to the screaming they could both hear coming from 2932 Humboldt Avenue North.

Wells ordered Deyo into the back of his squad car, and she started to do so, but

immediately got out of the car, allegedly to return her friend's car keys. When Wells attempted to physically force Deyo into the car, the two got into an altercation, during which Deyo pulled Wells's sweater over his head, and he pushed her to the ground and put a choke hold on her. She testified that she struggled because he was choking her, and she could not breathe. He alleged that he let her go when she yelled out that he was raping her. She alleged that he called her a "black bitch" and "nigger bitch" and repeatedly threatened to "put [her] out." She also alleged that during the struggle her clothing was torn, exposing her breasts. When Deyo escaped from Wells, she ran into her house.

Believing that Deyo had assaulted him, Wells called for and received back-up assistance from other officers in order to rearrest Deyo. At least six officers entered the house while others remained outside. One of the officers, respondent David Roiger, entered the kitchen and found Deyo clinging to her brother. Roiger claimed that as he attempted to pry Deyo loose, someone jumped on his back and hit him twice on the head. As he turned, Deyo's sister, appellant Virginia Kelly, grabbed him by the sweater and started gouging at his face. Roiger tried to free himself by repeatedly punching Kelly, kneeing her, and grabbing her by the hair. He claimed that at one point she had fallen to her knees facing his crotch, and he was afraid she was going to bite him. Kelly and Deyo testified that Kelly did not attack Roiger and that his assault of her was unprovoked and unnecessarily violent, apparently based on his mistaken belief that Kelly was Deyo (the two were dressed alike). The other officers in the kitchen testified that they did not see Roiger's handling of Kelly because they were occupied with other individuals or with keeping people from entering the kitchen. Wells eventually assisted Roiger in handcuffing Kelly.

Roiger escorted Kelly out of the house and admitted to pulling her hair to keep her from "headbutting" him, but denied intentionally slamming her into objects as she left the house. He also admitted placing her over the trunk of his squad car, but denied slamming her head onto it. Other eyewitnesses testified to seeing Roiger drag Kelly through the house by her hair, slam her into objects in their path, and slam her face onto the squad car trunk and window. At least one of the witnesses testified to hearing an officer say, in regard to Kelly, "This bitch thinks she's bad." Deyo claimed that Officer David Stocke held her in a chokehold and that her breasts were exposed both as she left her house and while she was being processed at the jail.

After they left the scene and drove around the corner to exchange prisoners, Roiger and Wells also denied that Roiger said to Wells, "Look what I did to this black bitch," and Welles replied, "Look what I did to this one." Roiger also denied Kelly's claim that he delayed her medical treatment and called her a "c* * *t" at the hospital.

Wells and Roiger sustained scratches and cuts as a result of the incident that night. Deyo sustained neck injuries, and Kelly sustained a lacerated lip and ripped ear. Both women also claimed that they sustained psychological injuries, including post-traumatic stress syndrome. Deyo and Kelly [1] initiated a civil action against the City of Minneapolis, the police chief, the four named officers, and other unnamed officers. They asserted claims of false arrest and imprisonment, assault and battery, negligent and intentional infliction of emotional distress, unauthorized use of force, and state and federal constitutional violations and statutory human rights violations.

Prior to trial, the court granted summary judgment to respondents on the negligent infliction of emotional distress claims and bifurcated the trial of appellants' federal claims against the city and police chief, staying discovery until after the trial involving the four individual respondents. After a six-week trial, the jury returned a verdict finding that Wells intentionally inflicted emotional distress on Deyo and awarded her $65,000 for past and future emotional distress, $10,-000 for past and future pain and suffering,

---

1. Another party attendee, Kenneth Dukes, was initially a plaintiff in this lawsuit, but his claims were later dismissed after he failed to respond to discovery requests.

$1,680 for lost earnings, and $5,866 for past and future medical expenses. The jury also found that Roiger intentionally inflicted emotional distress on Kelly and awarded her $66,000 for past and future emotional distress, $3,000 for pain and suffering, and $13,-220 for past and future medical expenses. The jury found in favor of respondents on all other claims.

Because the jury found that Wells and Roiger had not acted with malice, the trial court applied the doctrine of official immunity to bar respondents' liability. In its memorandum of law attached to its posttrial order denying JNOV or a new trial, the court stated that it found "certain aspects of [respondents'] conduct * * * personally repugnant" but was bound to apply the law "in this unfortunate case."

## ISSUES

I. Did the trial court err in applying the doctrine of official immunity to bar the police officers' liability for intentional infliction of emotional distress?

II. Do other trial errors mandate reversal of the verdict?

III. Did the trial court err in denying appellants' claims under the Minnesota Human Rights Act?

IV. Should this court strike portions of appellants' brief and appendix?

## ANALYSIS

### I.

The common law doctrine of official immunity protects government employees who may be subject to liability due to the performance of their work duties. *Davis v. Hennepin County,* 559 N.W.2d 117, 122 (Minn.App.1997), *review denied* (Minn. May 20, 1997). Official immunity protects an employee " 'from the fear of personal liability that might deter independent action.' " *Janklow v. Minnesota Bd. of Exam'rs for Nursing Home Adm'rs,* 552 N.W.2d 711, 715 (Minn.1996) (quoting *Elwood v. Rice County,* 423 N.W.2d 671, 678 (Minn.1988)). Under the doctrine, "individual governmental actors * * * remain immune only if they do not act

maliciously or intentionally." *Janklow,* 552 N.W.2d at 716; *see Rico v. State,* 472 N.W.2d 100, 107 (Minn.1991) (conduct malicious or willful only if official intentionally commits act official "then has reason to believe is prohibited").

Official immunity protects actions "exercised on an operational rather than a policymaking level, and it requires something more than the performance of 'ministerial' duties." *Pletan v. Gaines,* 494 N.W.2d 38, 40 (Minn.1992). The usual duties of police officers are not purely "ministerial" and may have an "executive character involving the exercise of discretion." *Id.* (quoting *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)). Police are "afforded a wide degree of discretion precisely because a more stringent standard could inhibit action." *Elwood,* 423 N.W.2d at 678. By the same token,

> [w]hile the doctrine of official immunity is intended to protect bona fide law enforcement practices, it is not intended to shield police brutality. Accordingly, liability will attach when a police officer intentionally commits an act which the officer, at the time of the act, has reason to believe is wrong.

*Baker v. Chaplin,* 497 N.W.2d 314, 318 (Minn.App.1993) (summary judgment denied where police officer, claiming official immunity, allegedly used deadly force with baton on cooperative demonstrator) (citation omitted), *aff'd,* 517 N.W.2d 911 (Minn.1994), *cert. denied,* 513 U.S. 1077, 115 S.Ct. 723, 130 L.Ed.2d 628 (1995). "Whether an officer's conduct merits immunity * * * turns on the facts of each case." *Elwood,* 423 N.W.2d at 678.

In Minnesota, the doctrine of official immunity has been applied at the summary judgment level to protect honest law enforcement actions or other actions where a plaintiff has failed to allege or show intent or malice by law enforcement. *See Pletan,* 494 N.W.2d at 40–41 (police officer immune from suit for deciding to engage in high-speed chase); *Elwood,* 423 N.W.2d at 678–79 (police officers immune from suit for entering home and momentarily restraining parents of person who threatened suicide and death to

spouse); *Lommen v. City of East Grand Forks,* 522 N.W.2d 148, 149 n. 1 (Minn.App.1994) (Minnesota police officer who collided with another motorist while pursuing suspect into North Dakota protected by official immunity); *Leonzal v. Grogan,* 516 N.W.2d 210, 214 (Minn.App.1994) (police officers immune from suit for consequences of responding to allegedly fabricated 911 call), *review denied* (Minn. July 27, 1994); *Reuter v. City of New Hope,* 449 N.W.2d 745, 751 (Minn.App.1990) (plaintiffs may not rely on bare allegations of malice to defeat application of official immunity and must "present specific facts evidencing bad faith"), *review denied* (Minn. Feb. 28, 1990). Summary judgment has been denied, however, where there are genuine issues of material fact regarding whether law enforcement acted maliciously. *See State by Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 573 (Minn.1994) (police allegedly detained suspects for longer than necessary and lied to suspects about basis for traffic stop); *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn.1990) (police officer allegedly pointed revolver at defendant's head and threatened to shoot without proper basis for doing so); *Soucek v. Banham,* 503 N.W.2d 153, 160–61 (Minn.App.1993) (police allegedly shot dog that had wolf-life appearance, despite knowing it was a dog); *Maras v. City of Brainerd,* 502 N.W.2d 69, 77–78 (Minn.App.1993) (police officer shot and killed drunk suspect who threatened him with knife), *review denied* (Minn. Aug. 16, 1993); *Gasparre v. City of St. Paul,* 501 N.W.2d 683, 687 (Minn.App.1993) (police officer allegedly twisted and broke arm of non-threatening suspect); *Carradine v. State,* 494 N.W.2d 77, 81 (Minn.App.1992) (police officer allegedly fabricated and misrepresented circumstances surrounding suspect's arrest), *aff'd in part, rev'd in part,* 511 N.W.2d 733 (Minn.1994).

■ Minnesota courts have addressed how malice in the official immunity doctrine relates to intent in tort law in the summary judgment context, but no reported case has applied these definitions on review of a jury verdict. The malice exception requires more than intent to do an act that a fact-finder later concludes is wrong; rather, "the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico,* 472 N.W.2d at 107; *see Greiner v. City of Champlin,* 27 F.3d 1346, 1355 (8th Cir.1994) (under *Rico* definition of malice, police officers officially immune from intentional tort claims at summary judgment stage because officers who injured partygoers while arresting them did not show malice). *But see Carradine,* 494 N.W.2d at 81 (malice in the official immunity doctrine linked with negligent infliction of emotional distress intent by this court).

■ The trial court in this case granted immunity to the police officers because the jury found that the officers had not acted with malice in intentionally inflicting emotional distress on appellants. Jury instruction No. 36 included the following definition of intentional infliction of emotional distress:

> The intentional infliction of emotional distress requires proof of four elements: First, the conduct of [respondents] must be so extreme and outrageous that it passes the boundaries of decency and is utterly intolerable to the civilized community. Second, the conduct must be intentional or reckless. Third, that the intentional conduct must cause emotional distress to [appellants]. Fourth, the distress must be so severe that no reasonable person could be expected to endure it.

Jury instruction No. 40 also included a definition of intent for intentional torts, as follows:

> Intentionally means that the actor either has a purpose to do the thing, or cause the result specified or believes that this act, if successful, will cause that result.

Jury instruction No. 41 defined "malice" as "the intentional doing of a wrongful act without legal justification or excuse, or otherwise stated, the willful violation of a known right."

These jury instructions are not individually erroneous and set out slight differences between the definitions of malice for official immunity purposes and intent for intentional torts. When read together and applied to the facts of this case, however, a finding of intentional infliction of emotional distress necessarily must lead to a finding of malice.

Unlike other intentional torts, such as assault, which may routinely occur during permissible police apprehension or arrest of a suspect, we cannot conceive of an example of proper police conduct that would include *intentional* infliction of emotional distress. *See* Minnesota Practice, CIVJIG 505 (1986) (definition of intentional infliction of emotional distress includes conduct "so extreme and outrageous that it passes the boundaries of decency and is utterly intolerable to the civilized community"). Almost invariably, conduct that fits this definition meets the definition of malice for official immunity purposes. *Cf. Burns v. State,* 570 N.W.2d 17, 20 (Minn. App.1997) (court anticipates "few circumstances where a public official would violate the Whistleblower Act without committing a malicious or willful wrong"). For this reason, we set aside the jury's finding of no malice. *See* Minn. R. Civ. P. 52.01.

 Further, we conclude that the trial court erred in characterizing the actions of Officers Wells and Roiger as discretionary for official immunity purposes. Actions of police officers responding to a police dispatch and making decisions based on their observations at the scene are generally discretionary and entitled to immunity. *See, e.g., Elwood,* 423 N.W.2d at 679 (police decision to enter home to apprehend suicidal person who threatened spouse discretionary); *Leonzal,* 516 N.W.2d at 214 (police officers immune from suit for consequences of responding to fabricated 911 call). The disproportionate response and gratuitous cruelty inflicted on Kelly and Deyo by Officers Wells and Roiger in this case, however, far exceeds any "discretionary conduct and is not subject to official immunity." *See Baker,* 497 N.W.2d at 318 ("official immunity is intended to protect bona fide law enforcement practices[;] it is not intended to shield police brutality").[2] For these reasons, we conclude official immunity is not available in this case. *Cf. Wright v. M.B. Hagen Realty Co.,* 269 N.W.2d 62, 66 (Minn.1978) (where single jury finding is contrary to evidence and inconsistent with other

jury findings supported by substantial evidence it will be set aside).

 Respondent City of Minneapolis filed a notice of review and claimed that the trial court erred in withholding a ruling on its motion for summary judgment because appellants failed to meet their burden of proof in establishing their intentional infliction of emotional distress claim. The trial court's ruling had the same effect as a denial of the city's summary judgment motion. As such, this ruling is not appealable. *See* Minn. R. Civ.App. P. 103.03 (enumerating appealable judgments and orders).

## II.

 Respondents assert that appellants' claim they were denied a fair trial may not be considered on appeal because it was not raised before the trial court. Only those matters specifically alleged in a new trial motion may be considered on appeal. *Waldner v. Peterson,* 447 N.W.2d 217, 219 (Minn. App.1989) (rationale for specificity rule is that it allows trial courts to correct errors). In appellants' motion for a new trial, they alleged "denial of the plaintiffs' right to a fair trial." Because this does not identify specific grounds that would justify a new trial, we affirm the order denying the motion. *See* Minn. R. Civ. P. 59.01 (setting out specific grounds for new trial motion). Further, in light of our decision regarding official immunity, we need not address the other issues appellants raised concerning the jury instructions, the special verdict form, and the denial of their motion for a posttrial *Schwartz* hearing.

## III.

 Appellants claim the trial court erred in adopting the jury's findings on discrimination. The Minnesota Human Rights Act requires discrimination cases to be "heard and determined by a judge sitting without a jury." Minn.Stat. § 363.14, subd. 2

---

**2.** In *Greiner,* the most analogous case factually to this case, the eighth circuit applied Minnesota law to an official immunity claim based on state law torts arising out of police response to a noisy party. 27 F.3d at 1355. While *Greiner* declined to infer "conscious [police] wrongdoing," the facts of this case are much more egregious and offer stronger evidence supporting intentional conduct on the part of police.

(1996). Although a court may use an advisory jury and adopt its findings in discrimination cases, the court is required to make its own findings. *See Doan v. Medtronic, Inc.,* 560 N.W.2d 100, 105 (Minn.App.1997), *review denied* (Minn. May 13, 1997); *see also* Minn. R. Civ. P. 39.02 (in all issues to be tried to court, court may sua sponte try issue with advisory jury); Minn. R. Civ. P. 52.01 (in action heard by advisory jury, court required to "find the facts specially").

 Here, the discrimination issues were heard and decided by the jury, which found no discrimination by any of the police officers. In its memorandum of law attached to the posttrial order denying reconsideration of appellants' human rights claims, the court detailed the conflicting testimony regarding discrimination and stated: "[T]he Court finds that [appellants] have not shown by the greater weight of the evidence that they were discriminated against based on their race." In its order for judgment, the court also made 35 findings of fact supporting its ruling. These findings and the court's conclusion are supported by the evidence and are sufficient to support the trial court's decision.[3]

### IV.

 Respondents moved to strike pages 23–31 and 206–226 of appellants' appendix and any references to these documents in appellants' brief. "The papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases." Minn. R. Civ.App. P. 110.01. Pages 206–226 consist of selections from the Minneapolis Police Department manual that were attached as an exhibit to appellants' "Supplemental Memorandum on the Issue of Ministerial and Discretionary Acts." This posttrial document was included in the trial court file. Some selections from the manual were also included as trial exhibits or exhibits attached to depositions that were filed with the court. Thus, they are part of the record. Page 23 is

a selection from the Civilian Police Review Authority, which was produced by respondents in discovery and was included as an exhibit in appellants' motion in support of admission of certain police data. As such, it was part of the record. Pages 24–30 include portions of the report findings and conclusions of the Civilian Review Board with regard to police conduct in this incident and records of prior complaints against Officers Stocke, Roiger, and Wells. These documents are not included in the trial court record. Page 31 is Kelly's police record, which was not included in the record. Thus, pages 24–31 are stricken from appellants' appendix and any references to these documents are stricken from their brief. *See Safeco Ins. Cos. v. Diaz,* 385 N.W.2d 845, 847 (Minn.App. 1986) (matters outside trial record may not be considered by appellate court and must be stricken), *review denied* (Minn. June 30, 1986).

### DECISION

We reverse the trial court's application of the doctrine of official immunity to bar the police officers' liability for intentional infliction of emotional distress, and we set aside the jury finding of no malice. Other alleged trial errors do not mandate reversal of the verdict. Further, the trial court did not err in denying appellants' claims under the Minnesota Human Rights Act. Finally, pages 24–31 are stricken from appellants' appendix and any references to those pages are stricken from their appellate brief because they include matters outside the trial court record.

**Affirmed in part and reversed in part; motion granted in part, denied in part.**

---

3. Respondents claim that this issue was not preserved for review because it was not raised in posttrial motions. In appellants' motion requesting posttrial relief, appellants ask "[f]or a finding in [their] favor * * * under the Minnesota Human Rights Act." Thus, the issue was properly raised before the trial court.