**Fredric V. JANKLOW, Respondent,**

v.

**MINNESOTA BOARD OF EXAMINERS FOR NURSING HOME ADMINISTRA-TORS, et al., Petitioners, Appellants.**

No. C6–95–816.

Supreme Court of Minnesota.

Aug. 29, 1996.

Steven M. Gunn, Asst. Attorney General, St. Paul, for Appellants.

Michael James Tostengard, Minneapolis, for Respondent.

League of Minnesota Cities, Carla J. Heyl, St. Paul, amici curiae.

## OPINION

GARDEBRING, Justice.

Once again, we consider an immunity question—in this instance, the availability of immunity, either official or statutory, as a defense to a claim brought against the state under Minnesota's Whistleblower Act. *See* Minn.Stat. § 181.932 (1994). Fredric Janklow sued his former employer, the Minnesota Board of Examiners for Nursing Home

Administrators (board), for violating the Whistleblower Act when it discharged him allegedly for reporting board practices that violated the law. The board moved for summary judgment, claiming that official immunity protected it from suit; the trial court denied the motion. The court of appeals affirmed, holding that respondent had established a prima facie Whistleblower claim and that the Whistleblower Act had abrogated the defense of official immunity as to claims brought under its provisions. The board appealed to this court. We agree with the court of appeals disposition of the case, but not its reasoning and therefore affirm on other grounds. .

The legislature created the board in the 1970s to license and discipline nursing home administrators in the state.[1] From its beginning until 1993, the board employed the same executive director, who administered the statutory functions of the board by processing licensing applications and complaints against nursing home administrators, along with the more routine functions of office management, including reimbursement of board members for allowed expenses. Apparently many of these matters were conducted in an informal manner, according to custom that had developed over time in the organization.

In 1993, when the board's original executive director died, the board hired respondent as its new executive director. Problems between the board and respondent began almost immediately. Upon assuming his new duties, respondent concluded that many of the board's informal administrative practices actually violated state law. For example, the board charged fees for some applications that were not allowed or in excess of that allowed by law; also, travel reimbursement to board members was apparently inconsistent with legal requirements. Respondent communicated his concerns to the assistant attorney general assigned to the board, who confirmed that some of the policies established by the previous executive director violated the law.

Accordingly, respondent detailed his observations and recommendations for changing then-current policy in a memo to the board chairperson, Michael Gibson, and vice-chair, Omar Schmidt. The three discussed respondent's concerns. Nevertheless, the board members informed respondent that the board had for many years operated in this fashion and, therefore, action to ameliorate these violations was not a priority.

Three other incidents of similar clashes between the board and respondent occurred during respondent's ten-month tenure. The first ensued when a board member requested that respondent provide her with copies of recent complaint files so the board member could provide certain information to a nationwide study. Respondent considered the request, consulted with the attorney general's office, and determined that to provide the files would violate Minnesota's Data Practices Act and, therefore, refused. The board member, upset at this refusal, ordered respondent to provide the files; respondent again refused. He detailed his reasons for the refusal in a memo, noted that "sanitized" versions of the same information (that is, with the information protected by the Data Practices Act blocked out) were readily available from another state agency, and attached the relevant statute.

In a second incident, respondent learned that the board had a large backlog of unresolved complaints. As he familiarized himself with the procedure for dealing with these complaints, he observed that the complaints were supposed to be routed through the attorney general's office before being filed as resolved. This practice was not being observed, so respondent suggested to board members the need for change. The board

---

1. The board is statutorily charged with the issuance of licenses to qualified individuals to work as nursing home administrators in the state. Minn.Stat. § 144A.24(c) (1994). It must develop standards for such licensing, create and maintain operations, such as investigations and examinations, to determine that applicants for licensure meet those standards, and establish procedures for ongoing monitoring of licensed individuals to ensure compliance with those standards. *Id.* at (a), (b), (d). The board also supervises other aspects of licensure, such as continuing education projects and obligations, as well as disciplinary procedures and, if necessary, license revocation. *Id.* at (e), (g). The board is empowered to employ and fix compensation for an executive director and other personnel necessary to carry out its functions. Minn.Stat. § 144A.22 (1994).

members informed respondent that, as the board was unlikely to be sued, this step was unnecessary and, thus, so was change. Respondent again checked with the attorney general's office and learned that his concerns were accurate, that the proper procedure was not being observed. He then again incurred the displeasure of certain board members when he began routing the unresolved complaints through the attorney general's office for clearance.

The third incident occurred when respondent discovered that the board, upon concluding the processing of a complaint against a nursing home administrator, routinely sent a letter that included the name of the complainant to that administrator. Again, respondent determined that this custom violated the Data Practices Act and, again, he confirmed this fact with the attorney general's office before raising the matter with board members. Again, the board members cited the unlikelihood of a suit based on this conduct and were upset by Janklow's adherence to the statute.

Respondent's attention to detail also resulted in difficulties in his working relationship with the board's other employee, an office manager/secretary. The office manager had worked under the first executive director and had served as temporary executive director before the board hired respondent. While respondent familiarized himself with the office procedures, the office manager continued to perform several executive director functions. Essentially, respondent was supervising an employee performing his job while he learned how to do the job. Friction resulted and communications broke down between the two. Respondent gave the office manager a mediocre performance evaluation that prompted her to seek union mediation.

In March 1994, chairperson Gibson requested that respondent not attend a scheduled board meeting. Another board member subsequently informed respondent that his performance, decisions in the abovementioned incidents, and personal characteristics and management style were sharply criticized at this meeting. Respondent told Gibson he believed that the meeting violated the Minnesota Open Meeting Law. The board met again in May; during discussion of a motion to terminate respondent's employment, board members cited their dissatisfaction with respondent's focus on following laws precisely and with his management style. They voted six to one, with one abstention, to terminate respondent.

After his termination, respondent sued the board alleging it violated the Whistleblower Act, which makes it unlawful for an employer to discharge, discipline, or threaten an employee who reports in good faith a violation or suspected violation of the law, or who refuses an employer's order because of an objective belief that following the order would violate the law. Minn.Stat. § 181.932, subd. 1(a) and (c). The board moved for summary judgment, arguing that, as an arm of the state, it was immune from suit for the discretionary actions of its officials. The trial court denied the motion and the court of appeals affirmed. We granted the state's petition for further review to determine the application of some type of immunity to claims brought against the state under the Whistleblower Act.[2]

The Whistleblower Act prohibits an employer from discharging, disciplining, or discriminating against an employee who reports in good faith a suspected violation of any state or federal law to the employer or state or federal authorities, participates, per request by a public body or official, in a hearing or investigation, or refuses an employer's order to perform an action that the employee has an objective basis to believe would violate a state or federal law. Minn.Stat. § 181.932, subd. 1(a)–(c). An "employer" under the Whistleblower Act "means any person having one or more employees in Minnesota and

---

**2.** The parties argued and briefed to this court only the application of so-called official immunity, the common law doctrine that extended the sovereign's immunity to protect his or her officers in the course of their official business. *See Restatement, (Second) of Torts* § 895D cmt. a.

After oral argument, however, we determined that further briefing would be beneficial and ordered the parties to submit additional briefs addressing the application of so-called statutory immunity, arising from Minn.Stat. § 3.736, subd. 3(b) (1994).

includes the state and any political subdivision of the state." Minn.Stat. § 181.931, subd. 3 (1994).

Before considering the applicability of immunity to suits brought under the Whistleblower Act, we think it useful to begin with a short primer on immunity. Immunity from suit in tort derives from the concept of sovereign immunity—that is, from the ancient idea that the King was infallible and the notion that to allow the monarch to be sued in his own courts was contradictory. *See* William L. Prosser, *Law of Torts* 970 (4th ed. 1971). This immunity found its way to the U.S. legal system and, today, exists at the federal, state, and local levels of government. *See Restatement (Second) of Torts* §§ 895A, 895B & 895C (1977) [hereinafter *Restatement*].

Responding to criticism that, for some injuries, a municipality should in fact bear the burden of its tortious conduct, courts later began to circumvent immunity. For example, courts imposed a distinction between "governmental" and "proprietary" functions and found liability in the instance of one, but not the other. *See Bailey v. City of New York*, 3 Hill 531 (N.Y.1842) (announcing the distinction). However, inconsistent application and ill-defined terminology led some to observe that the judiciary's effort to circumvent immunity had resulted in rules "as logical as those governing French irregular verbs." *Weeks v. City of Newark*, 62 N.J.Super. 166, 162 A.2d 314, 321 (1960), *aff'd* 34 N.J. 250, 168 A.2d 11 (1961); *see Reierson v. City of Minneapolis*, 264 Minn. 153, 156, 118 N.W.2d 223, 226 (Minn.1962) ("The principle * * * is easy to state but difficult to apply. When is the act governmental, and when is it proprietary?").

Minnesota recognizes two types of immunity: statutory immunity (also sometimes known as governmental or discretionary immunity) and official immunity. Statutory immunity, as its name implies, was legislatively created, while official immunity derives from the common law of sovereign immunity.

Statutory immunity was created when Minnesota waived its sovereign immunity to tort suits. This court took the first step towards erasing the state's sovereign immunity in 1975. *Nieting v. Blondell*, 306 Minn. 122, 132, 235 N.W.2d 597, 603 (Minn.1975).[3] A few months later, in 1976, the legislature formally abolished the state's immunity. Minn.Stat. § 3.736 (1976). As the federal government had done when it waived its sovereign immunity, Minnesota included a number of exceptions to its waiver. *See, e.g.,* 28 U.S.C.A. § 2680 (1994); Minn.Stat. § 3.736, subd. 3 (1994). Under the statutory immunity provision at issue here, the government is not liable for any "loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." Minn.Stat. § 3.736, subd. 3(b).[4] The legislature intended this exception to reinforce separation of powers by preventing judicial second guessing of legislative or executive policy decisions through the medium of tort suits. *See Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 718 (Minn. 1988).

Official immunity is a vestige of the sovereign's immunity, which at common law extended to the sovereign's officers. As they were acting in the sovereign's name, a suit against them was a suit against the sovereign and, therefore, untenable. An exception existed, however: if the officers acted illegally or outside the parameters of their charged duties, they waived their immunity and personal liability became possible. *See Restatement, supra,* at § 895D cmt. a. Official immunity is intended to protect public officials "from the fear of personal liability that might deter independent action." *Elwood v. Rice County*, 423 N.W.2d 671, 678 (Minn.1988).

---

3. The *Nieting* decision fulfilled a long-awaited expectation. While *Nieting* abolished sovereign immunity with respect to the state, this court had previously, in accordance with a national trend, done away with the similar immunity of municipalities and local government units, thereby signaling the eventual end of state immunity. *See Spanel v. Mounds View School Dist. No. 621*, 264 Minn. 279, 292, 118 N.W.2d 795, 803 (1962).

During its next session, the legislature acted on the court's decision to create a formal waiver. *See* Minn.Stat. § 466 (1963).

4. A similar provision provides for statutory immunity for discretionary acts for municipalities. *See* Minn.Stat. § 466.03, subd. 6 (1994).

Government officials are accorded near complete immunity for their actions in the course of their official duties, so long as they do not exceed the discretion granted them by law. *See Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). But, a public official has no immunity for intentional or malicious wrongdoing. *See Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (Minn.1976); Prosser, *supra,* at 989.

The two immunity concepts are similar, of course, but distinctions do exist. For instance, official immunity applies only in situations involving the act of an individual state official. In contrast, statutory immunity protects the government as an entity. The two immunities can also obviously operate in concert. Take the example of a high state official sued for her actions carrying out the policies of the state that employs her—the official might be entitled to official immunity, while the state might benefit from statutory immunity. *See, e.g., Rico v. State,* 472 N.W.2d 100, 105–07 (Minn.1991). Also, discretion has a broader meaning in the context of official immunity. *Elwood,* 423 N.W.2d at 678. By way of analogy: statutory immunity protects what might be termed policy judgment (which may take into account competing policy factors), *Rico,* 472 N.W.2d at 105–06, while official immunity protects more individual, professional judgment (wherein the judgment necessarily reflects the factors of a situation and the professional goal—for example, criminal apprehension). *See Pletan v. Gaines,* 494 N.W.2d 38, 41 (Minn.1992); *Elwood,* 423 N.W.2d at 678.

This analogy merely emphasizes the fact that the common origin of and overlap between these two concepts has made sharp distinctions difficult. For example, in both official and statutory immunity, courts must distinguish actions that merit immunity from those that do not. To do so, courts have separated actions that involve discretionary acts or policymaking from those which simply effectuate a decision or policy. The latter have been labeled "ministerial" and "operational," while the former are termed "planning" and "discretionary." Whether in official or statutory immunity, actions involving policy development or other exercise of discretion are generally immune. *Nusbaum,* 422 N.W.2d at 718 (statutory immunity context); *Elwood,* 423 N.W.2d at 677 (official immunity context).

■ Unfortunately, the immunity field is brimming with such terms and inconsistent usage has led to more than a little confusion. Therefore, in order to clarify the confusing nomenclature that has developed, we will henceforth refer to the immunity deriving from Minn.Stat. § 3.736, subd. 3 as "statutory immunity." The term "official immunity" is, we believe, plain enough—it is a common law doctrine, applying to individual governmental actors, who remain immune only if they do not act maliciously or intentionally.

■ We turn now to the question before us today: whether the board is entitled to immunity for claims under the Whistleblower Act for its termination of respondent.[5] The board argued in its original brief that official immunity applied in this instance. However, official immunity protects individuals and the board is statutorily authorized to hire and fire an executive director only acting in its joint capacity. Minn.Stat. § 144A.22 (1994). That is, no individual "official" is responsible for the acts that respondent claims were in violation of the Whistleblower Act. Thus, we conclude that official immunity does not apply to the facts before us.

■ However, there still remains the question of whether the board, as an entity of the state, may be entitled to statutory immunity. This type of immunity protects only "discretionary" actions; therefore, we must make a threshold determination that the board's termination of respondent was a discretionary act.

■ While certainly "almost every act involves some measure of discretion, * * * not every act of government is entitled to discretionary [*e.g.,* statutory] immunity."

---

**5.** Initially, we note that the court of appeals determined that respondent had established a prima facie claim under the terms of the Whistleblower Act. That holding was not appealed to us and so we do not take up the question of whether respondent has asserted a sufficient legal basis for his claims.

*Nusbaum,* 422 N.W.2d at 719 (quoting *Cairl v. State,* 323 N.W.2d 20, 23 (Minn.1982)). The decision to terminate an employee is almost always a discretionary act—especially when that employee is a member of a management team—because such decisions can involve the balancing of many complex factors. This court has previously observed that decisions to terminate employees involve policy decisions best made by the body charged with such decisions. *See Hueman v. Independent School District No. 77,* 243 Minn. 190, 194, 67 N.W.2d 38, 40–41 (Minn. 1954). However, an in-depth discussion of whether respondent's service to the board was such that its decision to terminate him involved this sort of balancing is unnecessary because, during oral argument, respondent conceded that his termination was a discretionary act.

 We must therefore determine if immunity is available to Whistleblower claims; that is, we must decide whether the legislature expressly or impliedly waived operation of statutory immunity when it enacted the Whistleblower Act. The Whistleblower Act contains no express waiver of the immunity protection, so we must look to the operation of the two statutes to ascertain if enactment of the Whistleblower Act impliedly waived the state's statutory immunity protection. An implied waiver will occur only where the two statutory provisions are not reconcilable. *See* Minn.Stat. § 645.26, subd. 1, 4 (1994).

Recently, we confronted a similar question in *State By Beaulieu v. City of Mounds View,* 518 N.W.2d 567 (Minn.1994). There, we considered whether the state could raise official immunity as a defense to an action under the Human Rights Act. *Id.* at 569–71. The Human Rights Act had no express waiver of official immunity and we determined that enactment of the Human Rights Act could impliedly waive official immunity if application of official immunity would frustrate the purpose of the Act. *Id.* at 570. However, fundamental to our analysis in *Beaulieu* was one of the differences between official and statutory immunity: the presence of a "safety valve." That "safety valve" is the notion that official immunity does not protect actions taken willfully or maliciously. *Susla,*

311 Minn. at 175, 247 N.W.2d at 912. We concluded in *Beaulieu* that acts that were violative of the Human Rights Act would also likely come within the "willful or malicious" exception and therefore, determined that the Human Rights Act and common law official immunity could operate in concert. *Beaulieu,* 518 N.W.2d at 570. Based on that conclusion, we held that official immunity was not impliedly waived. *Id.* The board relies heavily on the *Beaulieu* analysis, arguing that statutory immunity can coexist with the Whistleblower Act and, therefore, is not impliedly waived.

As the board would have it, the operation of statutory immunity is not inimical to the protections granted state employees by the Whistleblower Act. Relying on *Beaulieu,* the board contends that no conflict between the two statutes exists because the Whistleblower Act was designed to protect the general public from an employer's illegal conduct, as reported by a terminated employee. As the board views this situation, statutory immunity should protect the state only when it terminates or disciplines an employee serving in a position of trust and confidence; since not all of the state's employees fall within this category, many employees of the state might therefore still come within the ambit of the Whistleblower Act's protection. Moreover, even if the state is immune to suit from terminated or disciplined highly placed employees, state officials are still responsible to the public through higher state officials, such as the governor. *Rico,* 472 N.W.2d at 106. A state employee could report illegal state conduct and, although the state would be immune to suit by the employee, the state officials responsible would still have to answer to the governor, who, in turn, would have to answer to the voting public.

We do not agree. The Whistleblower Act was enacted to protect the general public, surely, but through the medium of shielding from retaliation employees who "blow the whistle." And we believe it is especially directed to the "whistleblowing" acts of governmental employees who expose instances of wrongdoing or illegality on the part of their governmental supervisors. The statutory immunity provision of Minn.Stat.

§ 3.736 applies even where the discretion of the governmental entity is abused; thus, statutory immunity does not contain the "safety valve" of official immunity, which strips the potential immunity from those who act maliciously or intentionally and upon which we relied in *Beaulieu.* We conclude that this is a critical distinction between the two types of immunity and that this distinction compels an outcome different than *Beaulieu.* If public officials are allowed to act against "whistleblowing" subordinates in malicious and willful ways, without threat of suit for illegal employment practices, the purpose of the Whistleblowing Act will be utterly thwarted. The two provisions simply cannot exist in concert.

Given the concern of the public about ethical behavior in government, the strong policy statement of the legislature in enacting the Whistleblower statute and the explicit inclusion of the state within its reach, we hold that the Whistleblower Act operates as an implied waiver of the statutory immunity provision of Minn.Stat. § 3.736. A decision to shield *potential government wrongdoing,* as urged by the state, would exacerbate public cynicism about the ethics of public officials, and this we do not choose to do.

Similar conclusions have been reached by other state courts. The North Carolina Court of Appeals has determined that the North Carolina Whistleblower statute, because it allows employees victimized in violation of the statute to sue for redress and by providing specific remedies, "represents a clear statutory waiver of sovereign immunity * * *." *Minneman v. Martin,* 114 N.C.App. 616, 442 S.E.2d 564, 566 (1994). A Texas court has adopted similar reasoning, holding that legislators are presumed to have selected statutory language carefully.

> Even a strict construction of sections 2, 3, and 4 [of Texas' whistleblower act] would not lead us to conclude that the Act, which purports to prohibit retaliation against public employees *by state and local governmental bodies,* withholds the authority to sue those very bodies. * * *.
>
> * * * The judiciary cannot, without hypocrisy, defer to the legislature the decision to protect whistleblowers, only to later eviscerate the legislature's effort to do so.
>
> * * * [Therefore] the Act unambiguously waives the governmental immunity from suit and from liability of state and local governmental entities in suits seeking redress for retaliation against public employees.

*Texas Dept. of Human Services v. Green,* 855 S.W.2d 136, 142–43 (Tex.App.—Austin 1993) (emphasis in original). Finally, a California court agrees that to recognize a discharge in violation of a whistleblower statute as a discretionary act to which immunity applies would "emasculate" the whistleblower statute and contravene its language and purpose. *Southern California Rapid Transit District v. Superior Court of Los Angeles County,* 30 Cal.App.4th 713, 726, 36 Cal.Rptr.2d 665 (Cal.App.1994).

Accordingly, we hold that the state cannot claim the protection of statutory immunity to protect it from claims under the Whistleblower Act. To do so would contravene the legislature's decision to include the state in the list of employers who must abide by the Whistleblower Act's provisions.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.