STATE OF MINNESOTA

IN SUPREME COURT

A14-0796

Court of Appeals

Gildea, C.J.

Nathan Kariniemi, et al.,

Took no part, Chutich, J.

Appellants,

vs.

Filed: July 27, 2016
Office of Appellate Courts

City of Rockford,

Respondent.

_____

Scott A. Johnson, Todd M. Johnson, Hellmuth & Johnson, PLLC, Edina, Minnesota, for appellants.

Paul A. Merwin, Patricia Y. Beety, League of Minnesota Cities, Saint Paul, Minnesota, for respondent.

Joseph J. Langel, Nathan B. Shepherd, Ratwik, Roszak & Maloney, P.A., Minneapolis, Minnesota, for amicus curiae Association of Minnesota Counties.

George C. Hoff, Justin Templin, Hoff, Barry & Kozar, P.A., Eden Prairie, Minnesota, for amicus curiae City Engineers Association of Minnesota.

Daniel J. Cragg, Jared M. Reams, Eckland & Blando LLP, Minneapolis, Minnesota, for amicus curiae Minnesota Association for Justice.

Paul D. Reuvers, Jason J. Kuboushek, Iverson Reuvers Condon, Bloomington, Minnesota, for amicus curiae Minnesota Association of Townships.

Kenneth H. Bayliss, Dyan J. Ebert, Cally Kjellberg-Nelson, Quinlivan & Hughes, P.A., Saint Cloud, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

_____

1

SYLLABUS

1. The City is entitled to vicarious official immunity because its City Engineer, though a private engineering firm, performed discretionary functions in close coordination with the City and therefore qualifies as a public official eligible for official immunity.

2. The City is entitled to vicarious official immunity on appellants' nuisance claim.

Affirmed.

OPINION

GILDEA, Chief Justice.

The question presented in this case is whether a municipality is entitled to vicarious official immunity for the allegedly negligent acts that its non-employee City Engineer—a private engineering firm—performed under a contract with the municipality. Homeowners brought this action, alleging that the non-employee City Engineer was negligent and caused a nuisance. The district court awarded summary judgment to the municipality on the negligence claim based on vicarious official immunity. But the district court denied summary judgment on the nuisance claim. The court of appeals affirmed in part and reversed in part, holding that vicarious official immunity applied to both the negligence and the nuisance claims. *Kariniemi v. City of Rockford*, 863 N.W.2d 430, 436 (Minn. App. 2015). Because we conclude that the municipality is entitled to vicarious official immunity for both claims, we affirm.

2

This case arises from the development of land located within the City of Rockford. As reflected in an agreement (the Agreement) between the City and the developer, the developer agreed to design and construct a grouping of townhomes named "Marsh Run." Under the Agreement, the City agreed to design, construct, and install "improvements," including "storm sewer mains," "catch basins," and "storm sewer retention ponds and structures." The Agreement reserved a large amount of oversight to the City for the improvements at Marsh Run and stated that the City would act through the "City Engineer."[1]

The Rockford City Council (the City Council) approved the construction of Marsh Run. In doing so, the City Council confirmed that "the design of all public and private streets," as well as "all grading, drainage, utilities and easements" at Marsh Run, would be subject to the "review and approval of the City Engineer."

The City does not have an employee designated as the "City Engineer." The City instead contracts with a private firm for the provision of those services. For several years, including during the Marsh Run project, Bonestroo, Rosene, Anderlik and Associates (Bonestroo) performed the functions of "City Engineer" under the terms of a

---

[1] For example, the Agreement provided that the "City Engineer [was to] inspect the installation and construction of all [improvements to be completed by the City] in progress and upon completion," and may further, "in his discretion, inspect the installation and construction of any [improvement to be completed by the developer]." The Agreement, furthermore, established that the "City [could] impose additional erosion and drainage control requirements . . . when, in the sole opinion of the City Engineer, they would be useful and appropriate." Ultimately, the "City Engineer" was to determine when all improvements had "been completed in accordance with the [City-approved] plans, specifications, and exhibits." In performing these functions, the City promised that the "City Engineer . . . [would] act reasonably."

Professional Services Agreement (PSA)[2] with the City. The purpose of the PSA was to permit the "City to obtain engineering and architectural services in a cost-effective and timely manner." More specifically, the City "desire[d] to retain [Bonestroo] from time to time to provide such professional services for general engineering needs as well as for the planning, design, and construction of public works, all as may be directed by the City." Under the PSA, for projects in which construction costs exceeded $50,000, the City paid Bonestroo a percentage of the construction cost of the project as determined by an applicable fee schedule. For projects under $50,000, the City paid Bonestroo on an "hourly basis."

Under the PSA, Bonestroo was required to perform "Basic Services" in three general phases: (1) the Feasibility Report Phase; (2) the Design Phase; and (3) the Construction Phase. For example, in the Feasibility Report Phase, Bonestroo prepared a feasibility report with six elements, submitted that report to the City Clerk 5 days before review by the City Council, and then presented the data contained in the report to the City Council at a public hearing. In the Design Phase, Bonestroo designed and prepared "detailed plans and specifications for the Project," while "periodically consult[ing] with the City to insure that the City's desires with respect to the Project [were] being

---

[2]    Bonestroo was acquired by Stantec Consulting Services, Inc., in 2011, but the PSA continued to govern the relationship between Bonestroo and the City. For clarity, and because the lower courts referred to the firm as Bonestroo, we do the same.

4

satisfied."[3] Additionally, following the approval of the designs at a public hearing, and "[u]pon receipt of the City Council authorization to proceed," Bonestroo "assist[ed] the City in obtaining and analyzing bids" and prepared a recommendation for the award of the Construction Contract. Finally, in the Construction Phase, Bonestroo organized, attended, and assisted the City at the preconstruction conference with the successful bidder; visited the Project site as necessary; and conducted "in the presence of the City's Representative, a final inspection of the Project." The PSA also provided for "Additional Services," including, for example, assisting "the City in preparing applications necessary for approvals, permits and licenses," attending neighborhood meetings and public hearings, and completing "[d]esign revisions resulting from . . . changes due to coordination of multi-agency reviews (e.g., City/County/MnDOT/etc.)." With respect to the provided-for services, the PSA noted, "[Bonestroo] . . . *act[ed] as the City's agent*." (Emphasis added.)

The PSA additionally mandated that Bonestroo "maintain a professional liability insurance policy, insuring payment of damage for legal liability arising out of the performance of professional services for the City, in the insured's capacity as Engineer, if such legal liability is caused by negligent acts, errors, or omissions of the insured." It also required that Bonestroo maintain other insurance, including comprehensive general liability insurance coverage.

---

[3] Under the PSA, the City agreed to "[d]esignate a single person to act as the City's Representative" with "complete authority to transmit instructions, receive information, and interpret and define the City's policies and decisions with respect to service covered by [the] Agreement."

5

Pursuant to the PSA, the City tasked Bonestroo with designing and overseeing the construction of the Marsh Run improvements. Accordingly, acting as "City Engineer," Bonestroo designed and oversaw the construction of the storm-water drainage system at Marsh Run.[4]

Appellants Nathan and Sanna Kariniemi, whose home is located at Marsh Run, contend that Bonestroo's professional services with respect to the storm-water drainage system were negligent and caused a nuisance.[5] Because of Bonestroo's alleged negligence, the Kariniemis assert, their property was flooded during significant rainfall in 2011 and again in 2013. The Kariniemis sought redress from the City on two occasions. But the City denied the Kariniemis relief, asserting that weed overgrowth, not a faulty design of the storm-water drainage system, caused the flooding. The City offered $4,500 to the Kariniemis to install protective measures to prevent further flooding but refused to pay for their claimed damages. The Kariniemis then commenced this action against the City, alleging negligence and nuisance claims.

The City moved for summary judgment, arguing that it is entitled to statutory immunity for the City Council's discretionary decisions and vicarious common law

[4]    The PSA did not require that Bonestroo actually construct the public works that it engineered. Rather, following the Design Phase, the PSA required that Bonestroo aid and advise the City regarding the awarding of the contract and oversee the project's construction.

[5]    The Kariniemis attributed the saturation and flooding of their property both to an adjacent road that placed their home "several feet under the grade of the road," as well as the actual storm-water drainage system, which they alleged was incapable of handling the additional water flow. Bonestroo designed both of these improvements. For simplicity, we collectively refer to these two improvements as the "storm-water drainage system."

official immunity for Bonestroo's discretionary decisions in its capacity as City Engineer.[6] Regarding official immunity, the City noted that "Plaintiffs allege that the design decisions of [Bonestroo] regarding storm water drainage at Marsh Run were negligent and the cause of their alleged nuisance." The City then argued that because "[its] only role was to design and supervise construction of the public improvements," and "because the design decisions required the exercise of professional judgment by the City's contract engineers," the "City has [vicarious] official immunity."

The Kariniemis opposed the City's request for summary judgment, contending that common law official immunity did not apply to Bonestroo's design decisions because it is an "independent contractor," not a full-time City employee. The Kariniemis also filed a cross-motion for summary judgment, arguing that there were no genuine issues of material fact regarding the City's liability for the design, approval, and construction of the storm-water drainage system, which "created a nuisance and constituted negligence."

The district court, ruling first on the City's motion, granted summary judgment to the City on the negligence claim. The court concluded that the City's contract City Engineer, Bonestroo, is entitled to official immunity for its discretionary design decisions and that the City, in turn, is entitled to vicarious official immunity for the negligent design claim. The court did not address the nuisance claim; instead, the court reasoned

---

[6] The district court held that the City is entitled to statutory immunity under Minn. Stat. §§ 466.01, 466.03, subd. 6 (2014), for the discretionary decisions of the City Council. That holding is not challenged on appeal.

7

that due to the City's failure to address the nuisance claim until its reply brief,[7] it would consider the nuisance claim only in addressing the Kariniemis' cross-motion.

Turning to the cross-motion, the district court denied summary judgment on the nuisance claim, reasoning that there were genuine issues of material fact for trial, including whether the "City's engineer . . . consider[ed] the Kariniemi property in his calculations and design." The court made no mention of whether official immunity applied to the nuisance claim. The court stated, however, that it contemporaneously "finds and concludes that the City is entitled to vicarious official immunity against Plaintiffs' negligent design claim."

The parties cross-appealed, and the court of appeals affirmed in part and reversed in part. *Kariniemi v. City of Rockford*, 863 N.W.2d 430, 432 (Minn. App. 2015). First, the court of appeals affirmed the district court's conclusion that the City is entitled to vicarious official immunity for the negligent design claim. *Id.* at 435. Second, the court of appeals reversed the denial of summary judgment on the nuisance claim, reasoning that the alleged nuisance arose from the same discretionary—and immune—conduct as the alleged negligence, and therefore vicarious official immunity also applied to the nuisance claim. *Id.* at 436. We granted the Kariniemis' petition for review to consider whether the City is entitled to vicarious official immunity.

---

[7]     The City argued in its reply brief that the Kariniemis could not "prove any wrongful conduct by the City" with respect to the alleged nuisance. Specifically, the City repeated that its' "role was to design the road and drainage culvert only," and that it did so "in accordance with generally accepted engineering practices." Moreover, upkeep of the drainage culvert (purportedly obstructed by overgrown weeds), the City argued, was the responsibility of the Marsh Run homeowners' association under the Agreement.

## I.

The Kariniemis argue that the courts below erred in concluding that the City is entitled to vicarious official immunity. The City disagrees. It contends that Bonestroo is entitled to common law official immunity and that the City, in turn, is entitled to vicarious official immunity. The applicability of immunity is a legal question that we review de novo. *Sletten v. Ramsey Cty.*, 675 N.W.2d 291, 299 (Minn. 2004).

Minnesota law recognizes two forms of governmental immunity: statutory immunity and common law official immunity. *Elwood v. Rice Cty.*, 423 N.W.2d 671, 678 (Minn. 1988) (contrasting the two forms of immunity). Although both forms of immunity are couched in terms of whether "discretion" or judgment was exercised by the relevant actor in performance of the relevant conduct, the import and rationale of each form of immunity are "entirely different," and we have "stressed the importance of distinguishing between" them. *Id.* Common law official immunity is the type of immunity at issue in this case.

Common law official immunity applies to "individual government[] actors." *Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs*, 552 N.W.2d 711, 716 (Minn. 1996); *Watson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 415 (Minn. 1996) ("Official immunity protects employees or agents of the government entity.").[8] We first

---

[8]    Statutory immunity, by contrast, is available only to "governmental entities," and "prevent[s] the courts from conducting an after-the-fact review which second-guesses 'certain policy-making activities that are legislative or executive in nature.'" *Watson*, 553 N.W.2d at 412 (quoting *Nusbaum v. Blue Earth Cty.*, 422 N.W.2d 713, 718 (Minn. 1988)).

recognized common law official immunity for judicial actors. *Stewart v. Cooley*, 23 Minn. 347, 350 (1877). Since *Cooley*, we have applied common law official immunity in a number of situations.[9] But the purpose of granting official immunity has remained constant: individual government actors must be able "to perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). To that end, a public official charged by law with duties that call for the exercise of judgment or discretion is not personally liable for damages unless the official is guilty of a willful or malicious wrong. *Id.*; *Janklow*, 552 N.W.2d at 716 ("Government officials are accorded near complete immunity for their actions in the course of their official duties, so long as they do not exceed the discretion granted them by law.").[10]

---

[9] *E.g.*, *Linder v. Foster*, 209 Minn. 43, 47-48, 295 N.W. 299, 301 (1940) (recounting the application of official immunity to "quasi judicial officers"; to "grand and petit jurors in the discharge of their duties"; to "assessors upon whom is imposed the duty of valuing property for the purpose of levying taxes"; to "commissioners appointed to appraise damages when property is taken under the right of eminent domain"; and to prosecuting attorneys; and then granting official immunity to defendants, "physicians and surgeons," who were "appointed by the court commissioner in accordance with [applicable statutory authority] to examine plaintiff and report to the court as to her mental condition," actions that were "in the scope of their duties" and therefore "within the protection of the rule and immune from suit"); *see also Mumm v. Mornson*, 708 N.W.2d 475, 490-93 (Minn. 2006) (applying official immunity to the discretionary decisions of a police officer in a high-speed pursuit); *Olson v. Ramsey Cty.*, 509 N.W.2d 368, 372 (Minn. 1993) (recognizing official immunity for the discretionary decisions of a social worker).

[10] We "generally extend[] official immunity vicariously to governmental entities after a government employee has been allowed official immunity." *Sletten*, 675 N.W.2d at 300. Extension of vicarious official immunity, however, "is not [] automatic." *Id.*; *see Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn. 1992) (explaining that vicarious immunity is

(Footnote continued on next page.)

In general, official immunity "turns on: (1) the conduct at issue; (2) whether the conduct is discretionary or ministerial . . . ; and (3) if discretionary, whether the conduct was willful or malicious." *Majeski*, 842 N.W.2d at 462. There is no dispute that the conduct at issue—the design of the storm-water drainage system—was discretionary. There is likewise no allegation of malice. And at oral argument, the Kariniemis conceded that had Bonestroo been a City employee, rather than acting under a contract with the City, official immunity would apply. The only issue before us, therefore, is whether the City loses vicarious official immunity solely because its City Engineer was not an employee of the City, but was instead working for the City under a contract.

We have not previously considered the precise issue presented here. But our precedent on official immunity provides the roadmap for the analysis. We have said that official immunity "protects *public officials* from the fear of personal liability that might deter independent action and impair effective performance of their duties." *Elwood*, 423 N.W.2d at 678 (emphasis added). The threshold question in this case, therefore, is whether Bonestroo properly qualifies as a "public official."

---

(Footnote continued from previous page.)

often impliedly granted, but is not necessarily granted). But failing to name an individual defendant in the complaint, as is the case here, is not a bar to vicarious immunity, because denying immunity on that basis "would allow plaintiffs to defeat immunity by declining to name the official as a defendant." *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 317 (Minn. 1998). Notably, the Kariniemis make no argument that vicarious official immunity would not apply here; their only argument is that the City's contract City Engineer is not entitled to official immunity because it is not a City employee. Accordingly, our analysis is limited to the underlying question of whether the actor who designed the storm-water drainage system is entitled to official immunity.

11

Generally, the designation of "public official" is limited to employees of a governmental entity, and a mere contract with the government does not transform an independent commercial actor into a "public official." But in this case, based on the function performed and the special relationship between the City and Bonestroo, we conclude that Bonestroo qualifies as a "public official" eligible for official immunity.

In terms of the function performed, there is no question that a city engineer's design of a storm-water drainage system is a governmental function—requiring the exercise of judgment and discretion—that is often carried out by public officials. Our cases have recognized the public nature of this type of work as we have long afforded official immunity to engineers and other similar officials for public infrastructure work. *See, e.g.*, *Johnson v. Steele Cty.*, 240 Minn. 154, 164, 60 N.W.2d 32, 39-40 (1953) (county engineer);[11] *Wilbrecht v. Babcock*, 179 Minn. 263, 264, 228 N.W. 916, 916 (1930) (commissioner of highways);[12] *Stevens v. N. States Motor, Inc.*, 161 Minn. 345, 348, 201 N.W. 435, 436 (1925) (county highway commissioners). This history not only indicates the importance of such positions in the performance of government work, but as

[11] In *Johnson*, we extended immunity to an official who the county had "appointed" to do the work at issue. 240 Minn. at 157, 60 N.W.2d at 36. We did not discuss whether that individual was a county employee, and we did not analyze or even discuss the issue presented in this case. We simply said, "[p]ublic officials and employees are not held personally liable for acts done honestly in the discretion which the law gives them." *Id.* at 164, 60 N.W.2d at 39-40.

[12] In *Wilbrecht*, we also took note of the numerous other jurisdictions that have long granted immunity to this type of official. 179 Minn. at 265, 228 N.W. at 916-17 (citing, *e.g.*, *Browne v. City of Bentonville*, 126 S.W. 93 (Ark. 1910); *Wadsworth v. Town of Middletown*, 109 A. 246 (Conn. 1920); *Schooler v. Arrington*, 81 S.W. 468 (Mo. Ct. App. 1904); *Hipp v. Ferrall*, 91 S.E. 831 (N.C. 1917); *Yealy v. Fink*, 43 Pa. 212 (1862)).

we acknowledged in *Wilbrecht*, 179 Minn. at 264, 228 N.W. at 916, engineering determinations on public-works projects, like those made by Bonestroo here, are precisely the types of discretionary governmental acts that we have long deemed worthy of official immunity.

That the duties and responsibilities of municipal engineers have a firm grounding in Minnesota statutes further supports the application of official immunity to these types of municipal officials. Although the employment of a permanent, city specific engineer is not statutorily mandated in Minnesota, the position—and the services provided by like professionals—is essential to the proper functioning of municipal government. For example, a number of statutes reference the city engineer position and impose specific duties and responsibilities upon city engineers and county highway engineers, as well as other similarly qualified professionals, who design and plan municipal infrastructure. *See, e.g.*, Minn. Stat. § 163.07, subd. 1 (2014) (mandating that the county highway engineer "make and prepare all surveys, estimates, plans, and specifications" for the highway work of the county);[13] Minn. Stat. § 429.041, subd. 2 (2014) (providing for the supervision of public improvement work "by the city engineer or other qualified person"); Minn. Stat. § 444.18, subd. 3 (2014) (explaining that prior to a municipality awarding a contract for the improvement of a storm sewer system, "the council shall

---

[13] *See also, e.g.*, Minn. Stat. § 165.03, subd. 2(b)(2) (2014) (providing that the county highway engineer shall regularly inspect municipal bridges located "within a municipality that does not have a city engineer regularly employed"); *cf.* Minn. Stat. § 163.07, subds. 1, 9 (providing that a county board "shall appoint and employ" a county highway engineer or "contract for the services of a county highway engineer with a county that appoints and employs such an engineer").

secure from the city engineer or some other competent person a report advising it" about matters such as feasibility and cost). The duties and responsibilities described in these statutes are similar to the work the City required of Bonestroo under the PSA. The fact that the Legislature affirmatively mandated that these functions be performed for some levels of government further supports application of official immunity here.

Having determined that the function Bonestroo performed supports the grant of official immunity, the remaining question, then, is whether official immunity should also apply to a city engineer retained via contract rather than through a traditional employment relationship. The particular relationship and close coordination between the City and Bonestroo here convince us that official immunity should apply to Bonestroo.

The relationship between the City and Bonestroo is defined in the PSA. The PSA makes clear that the City did not contract with Bonestroo to independently perform for-profit tasks. On the contrary, the City contracted with Bonestroo to perform the official functions of "City Engineer" on the City's behalf. Bonestroo, which acted through its engineers, performed these essential governmental tasks, as the City Engineer, in conjunction with City employees and officials. And in performing these functions, the PSA provided that Bonestroo acted as the City's agent. That the City imbued Bonestroo with the formal title of office, coupled with the authority to bind the City, confirms that the City considered Bonestroo and its agent engineers to be, in effect, City officials. This conferred power and authority further supports the grant of official immunity in this case.

The PSA also contemplated close collaboration between the City and Bonestroo. Specifically, the City charged Bonestroo with aiding, advising, and working directly with

14

the City regarding the feasibility, design, and progress of the City's public projects, including the storm-water drainage system at issue here. While the PSA was in effect, the City still maintained a vested interest in the planning of its public infrastructure. And as we stated in *Wilbrecht*, these types of public works engineering decisions are "*performed solely for the benefit of the public*." 179 Minn. at 264, 228 N.W. at 916 (emphasis added). In effect, Bonestroo operated as an extension of the City government, rather than as an independent commercial actor. That the City did not remove itself from the public work at issue, but instead required active collaboration between Bonestroo and City representatives, also supports the application of official immunity. *Cf. Chisolm v. Miss. Dep't of Transp.*, 942 So. 2d 136, 141-42 (Miss. 2006) (concluding that the state department of transportation was not liable for the acts of its contractor in building a bridge, as the contractor retained control over the means of meeting the contract specifications); *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 126 (Tex. 2015) (declining to extend governmental immunity to a private engineering company that designed a highway because "the government's right to control" the contractor's work was "utterly absent").

Finally, the relationship between the City and Bonestroo, and the required collaboration between those doing the work and the City, convince us that we ought not exalt form over substance by focusing solely on the contractual basis by which Bonestroo exercised its authority as the City Engineer. Bonestroo, although a private firm retained by contract, performed discretionary functions that required the exercise of judgment for the benefit of the public. The PSA required that Bonestroo work in close coordination

15

with the City, specifically designated Bonestroo as the City's "agent," and explained that it was more prudent for the City to use its limited resources to retain engineering help on a periodic and contractual basis. We refuse to penalize the City by categorically denying vicarious immunity simply because the City believed its limited resources, as a smaller municipality, were better utilized by retaining its engineering help on a part-time contractual, rather than a full-time employment, basis. *Cf. Putthoff v. Ancrum*, 934 S.W.2d 164, 169-70 (Tex. App. 1996) (granting official immunity to private physicians under contract to perform the various functions of a county's medical examiner's office).[14] We agree with the Supreme Court that the need to ensure that those who serve the government do so intrepidly and " 'with the decisiveness and the judgment required by the public good,' is of vital importance regardless [of] whether the individual . . . state actor works full-time or on some other basis." *Filarsky v. Delia*, ___ U.S. ___, 132 S. Ct. 1657, 1665 (2012) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974)).[15]

---

[14] Unless otherwise directed by the Legislature, cities are free to deploy engineering resources in whatever manner best suits the needs of the community. Here, our analysis depends substantially on the fact that the City did not have employees who fulfilled functions similar to Bonestroo. Put another way, the City chose to contract with Bonestroo to provide engineering services instead of employing a traditional city engineer. We need not, and do not, reach the issue of whether official immunity might extend to other arrangements between cities and engineering service providers.

[15] Although we have rejected the notion that "federal immunity principles under section 1983 also control state law," *Elwood*, 423 N.W.2d at 677, we have noted that "federal decisions interpreting qualified immunity under section 1983, though certainly not conclusive, are instructive . . . because section 1983 qualified immunity and common law official immunity further the same purpose." *Rico v. State*, 472 N.W.2d 100, 108

(Footnote continued on next page.)

The Kariniemis argue, however, that Bonestroo's mandated liability insurance coverage entirely negates the need for immunity here. We disagree and refuse to limit the application of immunity under these facts solely because the City required Bonestroo to procure liability insurance. Although the Supreme Court identified the procurement of liability insurance as one of the reasons why there was no need for immunity under the facts of *Richardson v. McKnight*, 521 U.S. 399, 411, 413 (1997), here, under Minnesota law, this fact alone does not tip the scales in favor of denying immunity. As a practical

---

(Footnote continued from previous page.)
(Minn. 1991). The Supreme Court's decisions in *Filarsky* and in *Richardson v. McKnight*, 521 U.S. 399 (1997), are consistent with our application of official immunity here.

In *Filarsky*, the Court held that a private attorney, temporarily retained by a city to act as its internal affairs investigator, was not foreclosed from invoking the protections of qualified immunity under 42 U.S.C. § 1983 (2012) "solely because" he was not a government employee. ___ U.S. at ___, 132 S. Ct. at 1660. The Court concluded that the history of common law immunity and the policies animating the doctrine both weighed in favor of granting immunity. *Id.* at ___, 132 S. Ct. at 1662-66. Additionally, the Court explained that individuals working on behalf of smaller cities should not be denied the protections of immunity simply because smaller cities lack the resources of larger cities to hire on a full-time basis, and instead "must rely on the occasional services of private individuals." *Id.* at ___, 132 S. Ct. at 1668.

In *Richardson*, the Court held that two prison guards working for a private prison management firm were not entitled to qualified immunity. 521 U.S. at 401. But the *Filarsky* Court explained that the combination of circumstances in *Richardson*—"a private firm systematically organized to assume a major lengthy administrative task, (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"— worked "to mitigate the [policy] concerns underlying recognition of governmental immunity" under section 1983. *Filarsky*, ___ U.S. at ___, 132 S. Ct. at 1667 (quoting *Richardson*, 521 U.S. at 413) (internal quotation marks omitted). The close coordination and agency relationship between the City and Bonestroo here make this case much different than *Richardson*.

matter, because individual government actors in Minnesota remain liable for negligently performed "ministerial" tasks, *see Watson*, 553 N.W.2d at 414-15, those actors are free to, and may likely, seek to obtain liability insurance regardless of whether they might be entitled to common law official immunity under certain circumstances. But more importantly, the Kariniemis' contention ignores the disruptive effect of litigation, and that the desire to avoid such disruption may deleteriously impact the "decisiveness and the judgment," *Filarsky*, ___ U.S. at ___, 132 S. Ct. at 1665 (quoting *Scheuer*, 416 U.S. at 240), of government actors such as Bonestroo, whose work is performed "solely for the benefit of the public," *Wilbrecht*, 179 Minn. at 264, 228 N.W. at 916.[16]

For the foregoing reasons, we hold that Bonestroo is entitled to common law official immunity for its discretionary conduct as City Engineer and that the City, in turn, is entitled to vicarious official immunity.[17]

---

[16] At oral argument, the Kariniemis also argued that granting immunity to the City's non-employee City Engineer would be at odds with the Municipal Tort Claims Act, Minn. Stat. §§ 466.01–.15 (2014), and its general rule of liability. The attempted analogy to statutory immunity principles is not apt within the context of common law official immunity. *See Watson*, 553 N.W.2d at 414 ("Official immunity differs from statutory immunity in that statutory immunity is 'designed to preserve the separation of powers,' whereas official immunity primarily is 'intended to insure that the threat of potential liability does not unduly inhibit the exercise of discretion required of public officers in the discharge of their duties.' " (quoting *Rico*, 472 N.W.2d at 107)).

[17] The Kariniemis do not challenge the vicarious application of official immunity and, therefore, we need not address the merits of that issue.

II.

We next turn to the question of whether the district court properly denied summary judgment with respect to the nuisance claim. On appeal from summary judgment, we assess whether "there are genuine issues of material fact and whether the district court erred in applying the law." *Sletten*, 675 N.W.2d at 299.

The court of appeals reasoned that the district court erred by concluding that the City had not "timely raised" immunity with respect to the nuisance claim because immunity involves the subject matter jurisdiction of courts and, therefore, can be raised at any time. *Kariniemi*, 863 N.W.2d at 436. We need not reach this timeliness issue, however, because the record before us indicates that, from the very beginning, the City pleaded immunity with respect to all claims arising out of the conduct at issue. In its answer, the City alleged: "Defendant City's actions are immune from liability under the doctrines of official immunity and vicarious official immunity." And the conduct that forms the basis for both the negligent design and nuisance claims is the same conduct. In *Sletten*, we explained that "our analysis does not focus on the nuisance but rather on the nature of the *underlying governmental activity that caused the nuisance*." 675 N.W.2d at 304 (emphasis added). Here, the activity that allegedly caused the nuisance is activity that official immunity covers. Accordingly, we hold that the district court erred by failing to grant the City immunity with respect to the nuisance claim when that claim was based on the same underlying conduct as the negligent design claim.

Affirmed.

CHUTICH, J., took no part in the consideration or decision of this case.

19